**In re W.Z.**

[Cite as *In re W.Z.*, 194 Ohio App.3d 610, 2011-Ohio-3238.]

Court of Appeals of Ohio,
Sixth District, Sandusky County.

No. S–09–036.

Decided June 30, 2011.

Timothy Young, Ohio Public Defender, and Sheryl Trzaska, Assistant Public Defender, for appellant.

Thomas L. Stierwalt, Sandusky County Prosecuting Attorney, and Norman P. Solze, Assistant Prosecuting Attorney, for appellee.

HANDWORK, Judge.

{¶ 1} This is an appeal from a judgment issued by the Sandusky County Court of Common Pleas, Juvenile Division, finding appellant to be delinquent based upon charged offenses of rape that occurred when he was 14 and 15 years old. Because we conclude that R.C. 2152.86 is unconstitutional, we reverse and remand as to that part of the trial court's judgment stating that appellant is automatically required to register as a sexual offender.

{¶ 2} In August 2009, appellant, W.Z., then 18 years old, was charged by indictment in the juvenile court with four counts of rape, in violation of R.C. 2907.02(A)(1)(b). The indictment, as later amended, alleged that the offenses occurred between June 2005 and November 2006, when W.Z. was 14 and 15 years old. In September 2009, appellant entered admissions to facts regarding two of

the counts. The juvenile court found appellant to be delinquent as to those two counts and dismissed the remaining two counts. At the court's inquiry, appellant then stated the underlying facts regarding the charges. The juvenile court also found appellant to be a serious youth offender ("SYO") and then sentenced him under Ohio's blended-sentence statutes.

{¶ 3} Appellant was committed to the Department of Youth Services ("DYS") for one year up to age 21 for each of the counts, to be served consecutively. As part of the blended sentence, the court also imposed an adult sentence of ten-years-to-life incarceration as to each count, to be served concurrently. The juvenile court stayed the adult sentence, pending a later determination of appellant's successful rehabilitation after completion of his juvenile sentence. The court determined, however, that it was required to classify appellant as a "Tier III" sexual offender, pursuant to R.C. 2152.86, which mandates that appellant register as a sexual offender and that he comply with certain reporting and notification requirements for life.

{¶ 4} Appellant now appeals from the court's classification of him as a Tier III sexual offender, setting forth the following:

{¶ 5} "First Assignment of Error:

{¶ 6} "The trial court erred when it classified [W.]Z. as a public registry-qualified juvenile offender registrant, as R.C. 2152.86 violates his right to due process of law. * * *.

{¶ 7} "Second Assignment of Error:

{¶ 8} "The trial court erred when it classified [W.]Z. as a public registry-qualified juvenile offender registrant, as R.C. 2152.86 violates his right to equal protection under the law. * * *.

{¶ 9} "Third Assignment of Error:

{¶ 10} "The trial court erred when it applied S.B. 10 to [W.]Z., as the retroactive application of S.B. 10 violates ex post facto and retroactivity prohibitions. * * *.

{¶ 11} "Fourth Assignment of Error:

{¶ 12} "The trial court erred when it classified [W.]Z. as a public registry-qualified juvenile offender registrant, in violation of the prohibition against cruel and unusual punishments. * * *.

{¶ 13} "Fifth Assignment of Error:

{¶ 14} "Trial counsel rendered ineffective assistance by failing to object to [W.Z.]'s unconstitutional classification. * * *."

{¶ 15} In his first assignment of error, appellant asserts that R.C. 2152.86 violates his right to due process of law by requiring the juvenile court, without any discretion, to automatically classify him as a Tier III sexual offender. We agree.

### Procedural Due Process

{¶ 16} Generally, legislation enjoys a strong presumption of constitutionality, unless the challenging party establishes beyond a reasonable doubt that the legislation is unconstitutional. *State v. Thompson* (2001), 92 Ohio St.3d 584, 586, 752 N.E.2d 276; *State v. Williams* (2000), 88 Ohio St.3d 513, 521, 728 N.E.2d 342. Nevertheless, in exercising the power of judicial review, no amount of deference to a legislative enactment should force a court to concede that something is that which it is not. *State v. Skilwies* (Jan. 8, 1999), 2d Dist. No. 17077, 1999 WL 6507, *7, citing *Marathon Oil Co. v. Bd. of Zoning Adjustment* (1975), 44 Ohio App.2d 402, 73 O.O.2d 525, 339 N.E.2d 856 (finding that a municipal ordinance declaring abandoned service stations a public nuisance per se with no hearing was arbitrary and unconstitutional).

{¶ 17} The constitutional rights that prohibit a state from depriving a person of "life, liberty, or property, without due process of law" are derived from both the federal and Ohio constitutions. See Fourteenth Amendment, United States Constitution, and Section 1, Article I of the Ohio Constitution. See also *State v. Hayden,* 96 Ohio St.3d 211, 2002-Ohio-4169, 773 N.E.2d 502, ¶ 6. Procedural due process requires that the government provide constitutionally adequate procedures before depriving individuals of a protected liberty interest. *Cleveland Bd. of Edn. v. Loudermill* (1985), 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494. A constitutionally protected liberty interest has been defined as freedom from bodily restraint and punishment. *Ingraham v. Wright* (1977), 430 U.S. 651, 673–674, 97 S.Ct. 1401, 51 L.Ed.2d 711.

{¶ 18} Although the concept is flexible, at its core, procedural due process under both the Ohio and United States Constitutions requires, at a minimum, an opportunity to be heard when the state seeks to infringe upon a protected liberty or property right. *Boddie v. Connecticut* (1971), 401 U.S. 371, 377, 91 S.Ct. 780, 28 L.Ed.2d 113. "For all its consequence, 'due process' has never been, and perhaps can never be, precisely defined. '[U]nlike some legal rules,' * * * due process 'is not a technical conception with a fixed content unrelated to time, place and circumstances.' *Cafeteria Workers v. McElroy* [ (1961) ], 367 U.S. 886, 895, [81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230]. Rather, the phrase expresses the requirement of 'fundamental fairness,' a requirement whose meaning can be as opaque as its importance is lofty." *Lassiter v. Dept. of Social*

*Servs. of Durham Cty., North Carolina* (1981), 452 U.S. 18, 24, 101 S.Ct. 2153, 68 L.Ed.2d 640.

{¶ 19} Fundamental fairness "serves to protect citizens generally against unjust and arbitrary governmental action, and specifically against governmental procedures that tend to operate arbitrarily. [It] serves, depending on the context, as an augmentation of existing constitutional protections or as an independent source of protection against state action." (Emphasis deleted.) *State v. Ramseur* (1987), 106 N.J. 123, 377, 524 A.2d 188 (Handler, J., dissenting). See also *In re Gault* (1966), 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (notions of fundamental fairness and due process extend certain criminal procedural and substantive rights to juveniles). This unique doctrine is not appropriately applied in every case but only in those instances when the interests involved are especially compelling. "Fundamental fairness is a doctrine to be sparingly applied. It is appropriately applied in those rare cases where not to do so will subject the defendant to oppression, harassment, or egregious deprivation." *State v. Yoskowitz* (1989), 116 N.J. 679, 712, 563 A.2d 1 (Garibaldi, J., concurring in part and dissenting in part).

{¶ 20} Further, the opportunity to be heard must occur at a meaningful time and in a meaningful manner. *Mathews v. Eldridge* (1976), 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18; *State v. Hochhausler* (1996), 76 Ohio St.3d 455, 459, 668 N.E.2d 457. The right to procedural due process is conferred not by legislative grace, but by constitutional guarantee. Thus, while the legislature may elect not to confer a particular right, "it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards." See *Arnett v. Kennedy* (1974), 416 U.S. 134, 167, 94 S.Ct. 1633, 40 L.Ed.2d 15 (Powell, J., concurring in part).

### Procedural Due Process as Applied to Juveniles

{¶ 21} The United States Supreme Court has explained, "From the inception of the juvenile court system, wide differences have been tolerated—indeed insisted upon—between the procedural rights accorded to adults and those of juveniles." *In re Gault* (1967), 387 U.S. 1, 14, 87 S.Ct. 1428, 18 L.Ed.2d 527. Although certain constitutional protections afforded adults, including notice, confrontation, the right to counsel, the privilege against self-incrimination, and freedom from double jeopardy, are applicable to juvenile proceedings, other protections, including trial by jury,[1] are not. See *Schall v. Martin* (1984), 467 U.S. 253, 263, 104 S.Ct. 2403, 81 L.Ed.2d 207; *McKeiver v. Pennsylvania* (1971), 403 U.S. 528, 545,

---

1. The Ohio General Assembly decided, however, that a juvenile deserves the right to invoke a jury as a factfinder. R.C. 2152.13(C)(1).

91 S.Ct. 1976, 29 L.Ed.2d 647; *In re Agler* (1969), 19 Ohio St.2d 70, 78, 48 O.O.2d 85, 249 N.E.2d 808.

{¶ 22} The United States Supreme Court has expressly recognized that "the Constitution does not mandate elimination of all differences in the treatment of juveniles." *Schall* at 263. In fact, the Supreme Court has expressly recognized that the "acceptance of juvenile courts distinct from the adult criminal justice system assumes that juvenile offenders constitutionally may be treated differently from adults." *Bellotti v. Baird* (1979), 443 U.S. 622, 635, 99 S.Ct. 3035, 61 L.Ed.2d 797. This different treatment is justified because of the state's interest in preserving and promoting the welfare of the child. *Schall*; *McKeiver*.

### Adult Criminal Court System vs. Juvenile Court System

{¶ 23} Historically, the United States has had two criminal justice systems, one for adults and the other for juveniles, each with specific goals and procedures. *United States v. Juvenile Male* (C.A.9, 2010), 590 F.3d 924, 931. The adult criminal justice system is public, which is viewed as "an essential protection for the rights of both the defendant and society at large." Id. This public nature promotes respect for and the integrity of the criminal justice system, while protecting the rights of the accused. Id. at 932, citing *Smith v. Doe* (2003), 538 U.S. 84, 99, 123 S.Ct. 1140, 155 L.Ed.2d 164.

{¶ 24} In contrast, juvenile proceedings are "civil" rather than criminal and, in theory, the priority of the juvenile system has been rehabilitation, rather than punishment. *Juvenile Male* at 926. Society generally refuses to penalize youth offenders as harshly or to hold them to the same level of culpability as adults, who are older and, presumably, wiser and more mature. Id. Unless bound over to the adult criminal system by a discretionary process, youthful offenders are adjudicated to be "juvenile delinquents" and are placed in special juvenile rehabilitation and detention centers. Id.

{¶ 25} In addition, an essential tenet of the juvenile system has been to maintain the privacy of the youthful offender. Id., citing 18 U.S.C. 5038(e) (neither the name nor picture of any juvenile shall be made public in connection with a juvenile-delinquency proceeding). Juvenile adjudications are held outside the public scrutiny and the burdens and stigmatization it imposes on those convicted of crimes. *Juvenile Male* at 932. Although juveniles may be denied certain procedural rights afforded to adult criminal defendants, such as public indictment or trial by jury, they are protected from the publicity and stigma of criminal prosecution. Id., citing *Smith v. Daily Mail Publishing Co.* (1979), 443 U.S. 97, 107, 99 S.Ct. 2667, 61 L.Ed.2d 399.

{¶ 26} Instead, juvenile proceedings are cloaked in confidentiality and designed to encourage "clinical" treatment and rehabilitation. *Juvenile Male,* 590 F.3d at 932. In addition, although discoverable by the court and certain other government agencies, delinquency findings do not automatically become a public part of a juvenile's permanent criminal record. Thus, a juvenile is shielded from the dissemination of information and "transparency" that characterizes the punitive way adults are tried for crimes. See *Smith v. Doe,* 538 U.S. at 99, 123 S.Ct. 1140, 155 L.Ed.2d 164 (adult criminal law tradition "insists on public indictment, public trial, and public imposition of sentence"). In short, the adult punitive system is public; the rehabilitative juvenile system, "quite deliberately, is not." *Juvenile Male* at 932.

### *Ohio Juvenile Law System*

{¶ 27} R.C. 2151.01 states that Chapter 2151, which governs proceedings in the juvenile court system, "shall be liberally interpreted and construed so as to effectuate the following purposes:

{¶ 28} "(A) To provide for the care, protection, and mental and physical development of children subject to Chapter 2151 of the Revised Code * * *;

{¶ 29} "(B) To provide judicial procedures through which Chapters 2151 and 2152 of the Revised Code are executed and enforced, and in which the parties are assured of a fair hearing, and their constitutional and other legal rights are recognized and enforced."

{¶ 30} Under Ohio law, a person "adjudicated delinquent shall be treated as a child until he reaches the age of 21." *In re Andrew,* 119 Ohio St.3d 466, 2008-Ohio-4791, 895 N.E.2d 166, ¶ 6. R.C. 2152.02(C), further provides as follows:

{¶ 31} "(1) 'Child' means a person who is under eighteen years of age, except as otherwise provided in divisions (C)(2) to (7) of this section.

{¶ 32} "(2) Subject to division (C)(3) of this section, any person who violates a federal or state law or a municipal ordinance prior to attaining eighteen years of age shall be deemed a 'child' irrespective of that person's age at the time the complaint with respect to that violation is filed or the hearing on the complaint is held.

{¶ 33} " * * *

{¶ 34} "(6) The juvenile court has jurisdiction over a person who is adjudicated a delinquent child or juvenile traffic offender prior to attaining eighteen years of age until the person attains twenty-one years of age, and, for purposes of that jurisdiction related to that adjudication, except as otherwise provided in this division, a person who is so adjudicated a delinquent child or juvenile traffic

offender shall be deemed a 'child' until the person attains twenty-one years of age."

{¶ 35} In line with the traditional view of the treatment of juveniles, punishment is not the goal of the Ohio juvenile system, except as necessary to direct the child toward the goal of rehabilitation. *In re Caldwell* (1996), 76 Ohio St.3d 156, 157, 666 N.E.2d 1367. Although juvenile-delinquency laws feature inherently criminal aspects, the Ohio Supreme Court has recognized that the overriding purpose of the juvenile system is "to provide for the care, protection, and mental and physical development of children, to protect the public from the wrongful acts committed by juvenile delinquents, and to rehabilitate errant children and bring them back to productive citizenship, or, as the statute states, to supervise, care for and rehabilitate those children." Id. at 157, citing R.C. 2151.01. Accordingly, juveniles adjudicated delinquent and adults convicted of a crime are not groups that are similarly situated. See *In re Vaughn* (Aug. 13, 1990), 2d Dist. No. CA89–11–162, 1990 WL 116936; *In re Cundiff* (Jan. 13, 2000), 10th Dist. No. 99AP364, 2000 WL 28845.

{¶ 36} "Evidence that the minor committed acts that would constitute a crime if committed by an adult is used only for the purpose of establishing that the minor is delinquent, not to convict him of a crime and to subject him to punishment for that crime." *State v. Weeks* (1987), 37 Ohio App.3d 65, 66, 523 N.E.2d 532, citing *In re Skeens* (Feb. 25, 1982), 10th Dist. Nos. 81AP882 and 81AP883, 1982 WL 3994. The principle underlying the juvenile justice system is to " 'combine flexible decision-making with individualized intervention to treat and rehabilitate offenders rather than to punish offenses.' " *In re Anderson* (2001), 92 Ohio St.3d 63, 65, 748 N.E.2d 67, quoting Rossum, Holding Juveniles Accountable: Reforming America's "Juvenile Injustice System" (1995), 22 Pepperdine L.Rev. 907, 912. Thus, when considering and reviewing any issues concerning the disposition of juveniles, the "inquiry must begin with the premise that the goal of the juvenile code is to rehabilitate, not to punish, while protecting society from criminal and delinquent acts during rehabilitation." Id.

### *Ohio Sexual-offender-Registration Laws—Megan's Law and the Adam Walsh Act*

{¶ 37} In 1996, the General Assembly enacted Ohio's first comprehensive registration and classification system for sex offenders, in compliance with the federal "Megan's Law." Am.Sub.H.B. No. 180, 146 Ohio Laws, Part II, 2560, 2601. Megan's Law provided for national sex-offender registration, classifications (sexually oriented offender, habitual sex offender, and sexual predator), and community notification. *State v. Cook* (1998), 83 Ohio St.3d 404, 407, 700 N.E.2d 570. Under that statute, certain statutory factors provided guidelines that assisted, but did not assign a particular weight to any factor or limit or control a judge's

discretion in determining the classification to be imposed upon a sexual offender. *State v. Bodyke*, 126 Ohio St.3d 266, 2010-Ohio-2424, 933 N.E.2d 753, ¶ 12.

{¶ 38} Under subsequent amendments to Megan's Law, the "sexual predator" label became permanent, the registration requirements were more demanding, the community-notification and residency restrictions became more extensive, and local law enforcement was granted the power to verify the registered offender's address. Nevertheless, the Ohio Supreme Court still upheld that law as remedial, rather than "punitive" as it pertained to adults. See *Bodyke* at ¶ 15, citing *State v. Ferguson*, 120 Ohio St.3d 7, 2008-Ohio-4824, 896 N.E.2d 110.

{¶ 39} In 2007, however, again in compliance with federal financial "incentives," the General Assembly repealed Megan's Law and passed Ohio's version of the federal Adam Walsh Child Protection and Safety Act ("AWA"), also known as S.B. 10. See R.C. Chapter 2950. In the AWA, the former three classification categories were replaced by "Tier I," "Tier II," and "Tier III" classifications based solely on the offender's offense. R.C. 2950.01. As it applies to adults, hearings are no longer required and judges no longer have discretion to determine which classification best fits each offender. *Bodyke* at ¶ 22. The trial court is thus "stripped of any power to engage in independent fact-finding to determine an offender's likelihood of recidivism." Id. Expert testimony is no longer presented, and the offender's criminal and social history are no longer relevant.[2] Id.

{¶ 40} The AWA also included the Sex-offender Registration and Notification Act ("SORNA"). SORNA was enacted "to protect the public from sex offenders and offenders against children, and in response to the vicious attacks by violent predators" against 17 named victims of sex crimes. 42 U.S.C. 16901. SORNA established a national system for sex-offender registration and required any individuals convicted of specified crimes, including aggravated sexual abuse, to register. 42 U.S.C. 16911(4)(A)(i). In its definition of "conviction," SORNA includes juvenile-delinquency adjudications of aggravated sexual abuse if the offender is age 14 years or older at the time of the offense. 42 U.S.C. 16911(8).

{¶ 41} Under Megan's Law, only the highest-risk offenders, sexual predators, were required to register with the local sheriff's department every 90 days for life, and community notification was also required. See former R.C.

---

2. As *Bodyke* noted, the Ohio Supreme Court had previously emphasized the importance of the classification hearing in the Megan's Law scheme. *Bodyke*, 126 Ohio St.3d 266, 2010-Ohio-2424, 933 N.E.2d 753, at ¶ 22, fn. 5, citing *State v. Eppinger* (2001), 91 Ohio St.3d 158, 165, 743 N.E.2d 881. The *Bodyke* court noted that under Megan's Law, each offender was assessed on an individual basis, "avoiding wholesale labeling of offenders as sexual predators based only on a conviction, and advancing the purpose of the legislation, which was to protect the public." Id.

2950.06(B)(1), 2950.07(B)(1), and 2950.01(A). Under the AWA, Tier III offenders have the same obligations, but the scope of registration is now greatly expanded, to include notice given to residents who live within 1,000 feet of the offender's residence and the prohibition of the offender from living within 1,000 feet of a school, preschool, or child day-care facility. R.C. 2950.11(A)(1)(a) and 2950.034.[3]

### Ohio AWA and Tier III Juvenile Offenders

{¶ 42} We will now consider whether the application of the AWA to juveniles violates procedural due-process rights in light of the overriding purposes and unique structure of the juvenile court system and the due-process fundamental liberty protections afforded to juveniles.

{¶ 43} R.C. 2152.86 provides as follows:

{¶ 44} "(A)(1) The court that, on or after January 1, 2008, adjudicates a child a delinquent child for committing an act shall issue as part of the dispositional order an order that classifies the child a juvenile offender registrant, specifies that the child has a duty to comply with sections 2950.04, 2950.041, 2950.05, and 2950.06 of the Revised Code, and additionally classifies the child a public registry-qualified juvenile offender registrant if the child was fourteen, fifteen, sixteen, or seventeen years of age at the time of committing the act, the court imposed on the child a serious youthful offender dispositional sentence under section 2152.13 of the Revised Code, and the child is adjudicated a delinquent child for committing, attempting to commit, conspiring to commit, or complicity in committing any of the following acts:

{¶ 45} "(a) A violation of section 2907.02 of the Revised Code, division (B) of section 2907.05 of the Revised Code, or section 2907.03 of the Revised Code if the victim of the violation was less than twelve years of age;

{¶ 46} "(b) A violation of section 2903.01, 2903.02, or 2905.01 of the Revised Code that was committed with a purpose to gratify the sexual needs or desires of the child.

{¶ 47} " * * *

{¶ 48} "(B)(1) If an order is issued under division (A)(1), (2), or (3) of this section, the classification of tier III sex offender/child-victim offender automatically applies to the delinquent child based on the sexually oriented offense the child committed, subject to a possible reclassification pursuant to division (D) of this section for a child whose delinquent act was committed prior to January 1,

---

3. Residence requirements, however, may not be constitutionally applied to an offender who purchased his or her home and committed the offense prior to the effective date of the statute. See *Hyle v. Porter*, 117 Ohio St.3d 165, 2008-Ohio-542, 882 N.E.2d 899, syllabus.

2008. If an order is issued under division (A)(2) of this section regarding a child whose delinquent act described in division (A)(1)(a) or (b) of this section was committed prior to January 1, 2008, or if an order is issued under division (A)(3) of this section regarding a delinquent child, the order shall inform the child and the child's parent, guardian, or custodian, that the child has a right to a hearing as described in division (D) of this section and inform the child and the child's parent, guardian, or custodian of the procedures for requesting the hearing and the period of time within which the request for the hearing must be made. Section 2152.831 of the Revised Code does not apply regarding an order issued under division (A)(1), (2), or (3) of this section."

{¶ 49} The new tier classifications under the AWA operate as a matter of law, not by judicial determination. *State v. Barker,* 2d Dist. No. 22963, 2009-Ohio-2774, 2009 WL 1653013, ¶ 9. Since the former classifications have been abolished, a legal designation of the highest class, "sexual predator," which previously required a hearing, no longer exists. *State v. Williams,* 12th Dist. No. 2008-02-029, 2008-Ohio-6195, 2008 WL 5052748, ¶ 15. Instead, sex offenders are now classified within tiers based solely on the offense for which they were convicted. *State v. Barker,* citing *Williams* and *State v. Clay,* 177 Ohio App.3d 78, 2008-Ohio-2980, 893 N.E.2d 909. As a Tier III sex offender, a juvenile is required to register with the local sheriff's office every 90 days for life and is subject to community notification. *State v. Dobson,* 2d Dist. No. 2008 CA 43, 2010-Ohio-279, 2010 WL 334900, ¶ 4. Only juveniles who were originally adjudicated delinquent prior to January 2008 and have been reclassified to be required to register as a sexual offender under the AWA may request a hearing to contest the reclassification. See R.C. 2152.86(D).

{¶ 50} Consequently, under the AWA, once a juvenile court determines that a defendant is a serious youth offender, the statutory tier structure itself usurps the traditional role of the court to determine what disposition best suits the individual offender's situation. Instead, the AWA determines which classification shall be assigned, based solely on age and offense. Although some court discretion remains for Tier I and II offenders, the court has no discretion as to any offender who is designated a serious youth offender and fits the criteria of Tier III.

{¶ 51} The juvenile justice system is structured to provide privacy so a delinquent child may be rehabilitated and not have to carry the stigma of youthful transgression into adulthood. To that end, the Ohio legislature has provided juveniles with certain liberty interests by statutory protection of privacy, including confidentiality of juvenile records and identity in court proceedings, closed hearings, and sealed records. These statutes demonstrate the legislature's acknowledgement that juveniles require special protections because "juveniles

and adults are different, * * * they commit crimes for different reasons, and * * * they should be treated differently in the eyes of the law." Timothy E. Wind, The Quandary of Megan's Law: When the Child Sex Offender is a Child (2003), 37 J.Marshall.L.Rev. 73, at 104–105. See also *Fletcher v. State* (June 16, 2008), Del.Fam.Ct. No. 0404010688, 2008 WL 2912048, at *15 (stating that upon consideration of several cases, including two United States Supreme Court cases, "there is certainly a growing nationwide recognition that there are differences between adult sexual predators and juvenile sex offenders, as well as that they should be treated differently").

{¶ 52} Subjecting juveniles to the mandates of R.C. 2152.86 obscures the foundational principles upon which the juvenile justice system was built.[4] Since this statute applies to offenders who have been kept in juvenile court, rather than transferred to the adult court system, the underlying legislative goal must still be that a youthful offender would have a reasonable chance of rehabilitation. Any dissemination of the child's identity, which is required by the registration and notification procedures, is in direct conflict with that goal. "Community notification may particularly hamper the rehabilitation of juvenile offenders because the public stigma and rejection they suffer will prevent them from developing normal social and interpersonal skills—the lack of these traits have been found to contribute to future sexual offenses." Michele L. Earl–Hubbard, The Child Sex-offender registration Laws: The Punishment, Liberty Deprivation, and Unintended Results Associated with the Scarlet Letter Laws of the 1990s (1996), 90 Nw.U.L.Rev. 788, 855–856.

{¶ 53} Automatic application of sex-offender-registry laws to juveniles who are Tier III offenders thwarts two fundamental underpinnings of the rehabilitation model: confidentiality and stigmatization. Specifically, R.C. 2152.86 takes away the statutory protection of privacy without due process for 14–to–17–year–old juveniles adjudicated for certain sex crimes, forcing the juvenile to carry the accompanying stigma for life, regardless of his rehabilitation status.

{¶ 54} In other words, without any other findings or support of the likelihood of recidivism, a child who commits a one-time mistake is automatically, irrebuttably, and permanently presumed to be beyond redemption or rehabilitation. The

---

4. "[B]oth the American Bar Association (ABA) and the Coalition for Juvenile Justice vehemently oppose the application of registration statutes to juvenile sex offenders." Britney M. Bowater, Comment, Adam Walsh Child Protection and Safety Act of 2006: Is There a Better Way to Tailor the Sentences of Juvenile Sex Offenders? (2008), 57 Cath.U.L.Rev. 817, 836. Specifically, "[t]he ABA argues that SORNA regulations, as applied to juveniles, contravene research that 'recognize[s] that juveniles are generally less culpable than adults, and that their patterns of offending are different from those of adults.' * * * Further, both organizations argue that the SORNA requirements will negatively impact juvenile delinquency adjudications and advancements in juvenile treatment." (Footnotes omitted.) Id. at 836–837.

effect of this presumption is that no matter what treatment or rehabilitation the youthful offender completes during his or her juvenile sentence in DYS, the youthful offender cannot prove that he is no longer a threat to society and should be removed from the registry system. Even if he is rehabilitated and lives a crime-free life after release from DYS, and any remaining blended sentence is never imposed, the youthful offender must still bear the burden of registration and public notification.

{¶ 55} Since the Tier III classification is automatic and irrevocable, from the outset, the youthful offender suffers the same consequences as his adult counterpart, with a designation that will forever taint his future and restrain his freedom to pursue a productive place in society. Thus, he cannot overcome or even have the opportunity to demonstrate that the Tier III registration and notification procedures should not apply to him.

{¶ 56} Moreover, the stated goal of registration and notification requirements is not deterrence of harmful behavior, but to protect the public from that behavior by dissemination of an offender's personal information. *State v. Cook*, 83 Ohio St.3d 404, 420, 700 N.E.2d 570; R.C. 2950.02. The General Assembly broadly asserts that "[s]ex offenders and child-victim offenders pose a risk of engaging in further sexually abusive behavior even after being released from imprisonment, a prison term, or other confinement or detention * * *." R.C. 2950.02(A)(2).

{¶ 57} In the juvenile context, however, there is no rational basis or purpose related to public safety for automatic registration. If a juvenile offender is classified as a Tier III offender, he or she will be in custody at DYS, likely until age 21. While in DYS, there is no risk that the juvenile offender will be a threat to others, since he or she will be confined away from the general public. If, just prior to release, the court determines that the offender has, in fact, been rehabilitated, then there is no need to register, since no threat to public safety exists.

{¶ 58} If, however, the court determines that the offender, at the age of 21, has not been rehabilitated, then the blended sentence or postrelease conditions will apply, and the court may impose the registration requirement. Delaying the registration requirement until that time is still risk free, since the offender either is no longer a danger or remains no danger to the public by being transferred to prison to serve the adult sentence. Therefore, the imposition of automatic registration on Tier III juvenile offenders at the time of adjudication serves no purpose because there would be an opportunity to determine whether the offender still posed a risk at the time of his or her potential release.

{¶ 59} We acknowledge that within the context of adult sex-offender registration, the United States Supreme Court has held that due process does not require

a hearing to determine the current dangerousness of the offender before publicly disseminating the information over the Internet. *Connecticut Dept. of Pub. Safety v. Doe* (2003), 538 U.S. 1, 7, 123 S.Ct. 1160, 155 L.Ed.2d 98. *Doe* is distinguishable from the present case, however, because that court was not addressing the issues surrounding *juvenile* sex offenders. Id. In holding that no hearing was necessary, the court noted that current dangerousness was not relevant to the statute, because public notification hinged on conviction of a sex offense alone. Id.

{¶ 60} In contrast, however, the United States Supreme Court has determined that juveniles should be treated differently from adults in other contexts, such as death-penalty cases. *Roper v. Simmons* (2005), 543 U.S. 551, 570, 125 S.Ct. 1183, 161 L.Ed.2d 1. Specifically, the *Roper* court noted:

{¶ 61} "The susceptibility of juveniles to immature and irresponsible behavior means 'their irresponsible conduct is not as morally reprehensible as that of an adult.' *Thompson* [*v. Oklahoma* (1998) 487 U.S.] at 835 [108 S.Ct. 2687, 101 L.Ed.2d 702] (plurality opinion). Their own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment. * * * The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed." Id.

{¶ 62} We also are aware that the Ohio Supreme Court has held that sexual-offender registration, notification, and verification requirements under R.C. Chapter 2950 are "remedial and do not constitute punishments." See *State v. Cook*, 83 Ohio St.3d 404, 700 N.E.2d 570. Again, in that case, the court was discussing the AWA as it affected adult offenders, not juveniles. Even if the Constitution did not require procedures to ensure due process in the juvenile-sex-offender-registration statutes, the doctrine of fundamental fairness does require these procedures.

{¶ 63} Fundamental fairness requires that juveniles be protected from "oppression, harassment, or egregious deprivation," which will surely result from the automatic registration. What may not be "punishment" in the adult justice system is most certainly punitive to juveniles, whose chance to be rehabilitated will be hampered if not obliterated by the knowledge that he or she cannot escape the registration requirement and resulting stigma. Requiring a rehabilitated juvenile to register on the sex-offender list is unnecessary to protect the public. It is, however, likely to cause the juvenile sex offender "to feel unwanted,

ostracized, and alienated as a result of community notification, [and] such a requirement can 'result in the unnecessary stigmatizing of many juvenile offenders for the rest of their lives.' " Bowater, 57 Cath.U.L.Rev., at 843.

{¶ 64} In dealing with the issue of improper sexual conduct, the differences between adults and juveniles are still real and distinct. When considering treatment success for these offenders, one researcher has indicated:

{¶ 65} "[J]uvenile sex offenders do respond better to treatment concepts over adult offenders * * * Juvenile offenders possess a less deeply ingrained deviate sexual pattern than do adult offenders; they are still exploring alternative ways to receive sexual gratification, and their sexual fantasy is still evolving and not fully joined with their permanent behavior. Additionally, the youth offender is more available for learning effective interpersonal and social skills than are adult offenders." Timothy E. Wind at 105–106.

{¶ 66} In addition, sex-offender-registry laws "perform a protective function and are predicated upon the notion that sex offenders, be they adult or adolescent, will likely offend, abuse, or molest again." Id. at 106. Research does not support this allegation of higher recidivism rates, however, especially for juvenile offenders. Id. "Existing studies suggest that a substantial proportion of these juveniles desist from committing sex offenses following the initial disclosed offense and intervention." Juveniles Who Have Sexually Offended—A Review of the Professional Literature, a report of expert studies and professional opinions prepared by Sue Righthand and Carlann Welch and issued in 2001 by Attorney General John Ashcroft, the Offices of Juvenile Justice and Delinquency Prevention, and the Office of Justice Programs of the United States Department of Justice. See also Elizabeth Garfinkle, Comment, Coming of Age in America: The Misapplication of Sex–Offender Registration and Community–Notification Laws to Juveniles (2003), 91 Cal.L.Rev. 163, 193 (stating that "sex-reoffending rates are even lower for juvenile sex offenders than for adult sex offenders").

{¶ 67} The appellate courts in our neighboring state of Michigan have also struggled with and expressed similar concerns regarding changes in the sexual-offender-registration statutes and the protection of juvenile confidentiality. See In re Hardwick, (Feb. 19, 2004), Mich.App. No. 239951, 2004 WL 316459. The Hardwick court noted:

{¶ 68} " 'Although we hold that the [sexual-offender-registration act] is not an unconstitutional deprivation of respondent's liberty or privacy interests, we express our concern over the draconian nature of this act. * * * Although we do not debate the seriousness of the circumstances surrounding the offense in this particular case, we question the propriety of publicly and permanently labeling juveniles as convicted sex offenders. Traditionally, our justice system has distinguished between juvenile delinquency and adult criminal conduct. MCL

712A.1(2), which confers jurisdiction over juveniles on the family division of the circuit courts, specifically states that "proceedings under this chapter are not criminal proceedings." MCL 712A.23 also limits the admissibility of juvenile records in both criminal and civil proceedings in an attempt to "hide youthful errors from the full glare of the public. * * *." *People v. Poindexter,* 138 Mich.App. 322, 326, 361 N.W.2d 346 (1984). The public notification provisions of the [sexual-offender-registration act] appear to conflict with our traditional reluctance to criminalize juvenile offenses and our commitment to keep juvenile records confidential * * *. We invite the Legislature to reconsider whether the implied purpose of the act, public safety, is served by requiring an otherwise law-abiding adult to forever be branded as a sex offender because of a juvenile transgression.' " *Hardwick,* 2004 WL 316459, at *2, quoting *People v. Wentworth* (2002), 251 Mich.App. 560, 568–569, 651 N.W.2d 773.

{¶ 69} The *Wentworth* court had additionally noted that in prior cases it upheld the constitutionality of the juvenile registration requirements in part because juveniles were excluded from public notification. *Wentworth* at 779. The court explained that in those cases, there were strict statutory safeguards in place to protect the confidentiality of registration data concerning juvenile sex offenders. Id. The *Wentworth* court cautioned that "the recent amendment of the statute removing those confidentiality safeguards raises questions about the continuing validity of our holding in [*In re*] *Ayres*[, 239 Mich.App. 8, 608 N.W.2d 132 (1999)] ('Sex-offender registration Act does not impose "punishment" prohibited by cruel and unusual punishment provision of state constitution).' " Id.

{¶ 70} Ultimately, given the statutory protections of the juvenile code, the long-established unwillingness to criminalize juvenile offenses, the underlying purpose of rehabilitation in the juvenile justice system, and the commitment to keep juvenile records confidential, we conclude that juveniles should be treated differently from adults in sex-offender-registry statutes. Specifically, due process requires that a juvenile sex offender receive a hearing to determine whether he has been rehabilitated before his information is released for all the world to see, especially in light of Internet access to that information.

### Application to W.Z.

{¶ 71} In the present case, once the juvenile court found W.Z. to be a serious youth offender, his fate was sealed. Because of the SYO status and the particular offense, the court had no discretion under R.C. 2152.86. W.Z. was required to register, even while being expected to comply with all recommended therapy and programs to be rehabilitated. The conflict between the sexual-offender-registration requirement and the underlying purposes of the juvenile system is crystal clear when reviewing the following admonishment of the

juvenile court to W.Z. during the adjudicatory hearing. The court stated that it was imposing a blended sentence, which permits:

{¶ 72} "[A] traditional juvenile sentence as well as the potential for an adult sentence should the juvenile rehabilitation not be accomplished. It is the Court's feeling that doing so is in complete concurrence with the overriding philosophy of the juvenile court in that it allows an extra carrot and stick so to speak for [W.Z.], and what I mean by that, [W.Z.], is that you will be facing a traditional sentence through juvenile court, but also having a very large hammer hanging over your head. That hammer serves multiple purposes. It should help encourage you to successfully complete your treatment, your programs, the other things I'm going to ask you to do while going through your juvenile portion of the sentence, but it also serves as a potential punishment should you not be able to be rehabilitated, which given the factors, is clearly appropriate. So being treated as a serious youthful offender ultimately gives you a little extra encouragement to do well through your treatment and counseling and other things, but you need to realize it also opens up the door to very, very harsh consequences should you not successfully complete that."

{¶ 73} In committing W.Z. to DYS for a minimum of one year up to the maximum age of 21 on each of the two charges, to run consecutively, the court insured that appellant would spend at least two years in DYS. The court stayed the concurrent 10–year adult sentences, however, "conditioned on [W.Z.] success-fully completing all conditions of placement and community control through the Department of Youth Services." The court then stated that if appellant success-fully completes "everything at DYS, and you successfully complete all your parole with DYS, then the adult portion of the sentence does not happen and you don't need to go to prison."

{¶ 74} In a lengthy explanation, the juvenile court then instructed appellant regarding the four-section sexual-offender-registration form and the information he would need to provide, including his social security number, his conviction, his current residence, his employment, and other information. The court noted that "all that means is that you are going to have to notify the sheriff's office wherever you ultimately reside when you get out of DYS or, ultimately, if you are required to serve any of your prison time, when you get out of prison."

{¶ 75} In other words, even before appellant had begun his rehabilitation and therapy at DYS, he was told that even if he does everything right, is rehabilitat-ed, and does not have to serve the adult portion of the blended sentence, he will still have the registration requirement and will be branded a "sexual offender" for the rest of his life. In our view, this makes the court's "carrot" much less desirable, because even if totally rehabilitated, appellant will still have the sexual-

offender-registration "albatross" around his neck as he tries to find his niche in the world.

{¶ 76} We also find it ironic that for the purposes of reporting decisions regarding delinquent juvenile adjudications, even for sexually oriented offenses, Ohio appellate courts protect the child's privacy and use only the child's initials in the caption or the text. At the same time, however, Ohio's AWA automatically requires Tier III juvenile sexual offenders to register and to report to local authorities, which removes all anonymity prior to the outcome of any rehabilitation efforts. This dooms the child offender to suffer adult consequences, even if he has successfully completed his programs and is deemed to be rehabilitated.

{¶ 77} We certainly recognize and do not diminish the injury and pain that juvenile sex offenders may have caused in the lives of their victims, including the damage W.Z. caused to his two victims. We are not advocating that those juveniles not receive consequences for their actions. But due process should be satisfied before a juvenile is given a life sentence of registering as a sex offender, especially since Tier I and II juvenile sexual offenders do not automatically face the same consequences as Tier III offenders.

{¶ 78} While the goals of sex-offender registry are admirable, the application of the registry to the 14–to–17–year–old juveniles who have not been transferred out of the juvenile court system to the adult system violates procedural due process and fundamental fairness. The very due-process safeguards that would make the statute constitutional are simply missing from Ohio's Tier III classification scheme: hearings requiring clear and convincing evidence of dangerousness prior to registration on the list, limiting registration for juveniles, and limiting or excluding public notification. Those interests are compelling.

{¶ 79} The automatic registry requirement for Tier III offenders in R.C. 2152.86 is antithetical to the goals and purposes of the juvenile court system. It removes the discretion of the trial court judge to make certain determinations and deprives Tier III juveniles of due process to determine the likelihood of recidivism before assigning the lifetime label of sexual offender. Therefore, we conclude that R.C. 2152.86 is unconstitutional to the extent that it prematurely requires, at adjudication, the automatic registration as a sexual offender by juveniles based solely on the commission of certain sex crimes, without the opportunity to present rebuttal evidence at such time as the juvenile offender is released from DYS.

{¶ 80} Accordingly, appellant's first assignment of error is well taken.

{¶ 81} Appellant's remaining three assignments of error are moot.

{¶ 82} The judgment of the Sandusky County Court of Common Pleas, Juvenile Division, is reversed, and the cause is remanded for proceedings

consistent with this decision. Appellee is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment reversed.

PIETRYKOWSKI and SINGER, JJ., concur.