129 Nev., Advance Opinion 52

# IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| THE STATE OF NEVADA, Petitioner, vs. THE EIGHTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA, IN AND FOR THE COUNTY OF CLARK; AND THE HONORABLE WILLIAM O. VOY, DISTRICT JUDGE, FAMILY COURT DIVISION, Respondents, and LOGAN D., A MINOR, Real Party in Interest. | No. 52477 |



FILED

JUL 25 2013

Original petition for a writ of prohibition or mandamus challenging an order of the juvenile court granting the real party in interest's motion to declare Assembly Bill 579, enacted as Chapter 485 of the 2007 Statutes of Nevada, unconstitutional as applied to juvenile sex offenders.

*Petition granted.*

Catherine Cortez Masto, Attorney General, Carson City; Steven B. Wolfson, District Attorney, and Jonathan VanBoskerck, Chief Deputy District Attorney, Clark County,
for Petitioner.

Philip J. Kohn, Public Defender, and Howard Brooks and Susan Deems Roske, Deputy Public Defenders, Clark County,
for Real Party in Interest.

13-21914

Margaret A. McLetchie, Las Vegas,
for Amicus Curiae American Civil Liberties Union of Nevada.

---

BEFORE THE COURT EN BANC.

## OPINION

By the Court, DOUGLAS, J.:

In this original writ proceeding, we consider whether Assembly Bill 579, enacted by the 2007 Nevada Legislature, providing for the retroactive application of mandatory sex offender registration and community notification requirements on juveniles adjudicated for certain sex offenses, violates the Due Process and Ex Post Facto Clauses of the United States and Nevada Constitutions. We conclude that registration and community notification do not violate the Due Process or Ex Post Facto Clauses. We therefore grant the petition.

### FACTS AND PROCEDURAL HISTORY

Real party in interest Logan D. was adjudicated delinquent for one count of lewdness with a minor on October 4, 2006, for an offense alleged to have occurred in August 2006 when he was 17 years old. The law in place at the time of Logan's adjudication provided the juvenile court with discretion to require a juvenile adjudicated for a sexual offense to submit to adult registration and community notification if the court determined at a hearing that the juvenile was not rehabilitated or was likely to pose a threat to public safety. 2005 Nev. Stat., ch. 507, § 26, at

2873-74. Pursuant to that law, the juvenile court scheduled a hearing for September 2009 to determine whether Logan would be required to register as an adult sex offender. Before that hearing took place, however, the Legislature passed Assembly Bill (A.B.) 579. That bill, codified in relevant part in NRS Chapter 62F and NRS Chapter 179D, removed the juvenile court's discretion to determine whether a juvenile sex offender should be subject to registration and community notification as an adult. The new law mandated that all juveniles aged 14 and older who are adjudicated for certain sex offenses register as adult sex offenders and be subject to community notification; the law prohibited the imposition of these requirements on juvenile offenders under the age of 14. NRS 62F.200; NRS 179D.035; NRS 179D.095(1); NRS 179D.441; NRS 179D.475. On December 28, 2007, six months before A.B. 579 was to take effect, 2007 Nev. Stat., ch. 485, § 57, at 2780, Logan and approximately 20 other juveniles filed motions asking the juvenile court to find the bill unconstitutional as applied to juvenile sex offenders. The juveniles asserted that A.B. 579 was unconstitutionally vague and violated procedural and substantive due process as well as the Contracts, Ex Post Facto, and Cruel and/or Unusual Punishment Clauses of the federal and state constitutions.

After full briefing and several hearings, the juvenile court entered an order declaring A.B. 579 unconstitutional as applied to juvenile sex offenders. The juvenile court concluded that the statutory scheme violated substantive due process because it did not bear a rational

relationship to the "rehabilitation and public safety goals of the Juvenile Court and the Department of Juvenile Justice nor the public safety goals of the Adam Walsh Act." The juvenile court determined that prohibiting registration and community notification for high-risk juvenile sex offenders under the age of 14 while mandating those requirements for low-risk juvenile sex offenders over the age of 14 was irrational because such an approach does not serve to prevent recidivism or further rehabilitation.

The State filed an appeal from the juvenile court's order, and the affected juveniles, including Logan D., filed cross-appeals. This court dismissed the appeals for lack of jurisdiction. *In re Logan D., a Minor*, Docket No. 51682 (Order Dismissing Appeals, September 5, 2008). This original petition for a writ of prohibition or, alternatively, mandamus followed.[1]

## DISCUSSION

A writ of prohibition is available to halt proceedings occurring in excess of a court's jurisdiction, NRS 34.320, while a writ of mandamus may issue to compel the performance of an act which the law requires "as a duty resulting from an office, trust or station," NRS 34.160, or to control

---

[1]In April 2010, this court approved the parties' stipulation to stay this proceeding pending resolution of federal litigation challenging the constitutionality of A.B. 579 as applied to adult sex offenders. That litigation has now been resolved and A.B. 579 determined constitutionally sound as applied to adult offenders. *ACLU of Nev. v. Masto*, 670 F.3d 1046 (9th Cir. 2012). Accordingly, we now lift the stay of this matter.

an arbitrary or capricious exercise of discretion, *see Round Hill Gen. Improvement Dist. v. Newman*, 97 Nev. 601, 603-04, 637 P.2d 534, 536 (1981). This court will exercise its discretion to consider petitions for extraordinary writs "only when there is no plain, speedy and adequate remedy in the ordinary course of law or there are either urgent circumstances or important legal issues that need clarification in order to promote judicial economy and administration." *Cheung v. Eighth Judicial Dist. Court*, 121 Nev. 867, 869, 124 P.3d 550, 552 (2005) (internal quotation marks and footnote omitted).

This petition raises important legal issues potentially affecting all persons who have been adjudicated delinquent for certain sex offenses since 1956. And because this court previously determined that the challenged order was not substantively appealable, petitioner has no other remedy at law. We therefore exercise our discretion to consider the merits of this petition.

*Background*

In 2006, the United States Congress enacted the Adam Walsh Child Protection and Safety Act, which included the Sex Offender Registration and Notification Act (SORNA). 42 U.S.C. §§ 16901-16962 (2006). SORNA was promulgated "to protect the public from sex offenders and offenders against children, and in response to . . . vicious attacks by violent predators." *Id.* § 16901. SORNA mandates, in relevant part, that each state require persons convicted of certain sex offenses to periodically register with authorities and provide specified information, *id.* §§ 16913-

SUPREME COURT
OF
NEVADA

(O) 1947A

16914, maintain a statewide sex offender registry containing specific information pertaining to each registered sex offender, *id.* §§ 16912 & 16914, implement a community notification program, *id.* § 16921, and provide a criminal penalty for sex offenders who fail to comply, *id.* § 16913. SORNA specifically defines the term "convicted" as including juveniles adjudicated delinquent for certain sex offenses. *Id.* § 16911(8). A state's failure to timely comply with the Act's requirements in a given fiscal year results in a 10-percent reduction of certain funds from the federal government. *Id.* §§ 16924-16925.

In response to the federal legislation, Nevada passed A.B. 579, with an effective date of July 1, 2008. 2007 Nev. Stat., ch. 485, § 57, at 2780. Under Nevada's version of the law, a "sex offender" is defined to include any person who, after July 1, 1956, has been adjudicated delinquent for sexual assault, battery with the intent to commit sexual assault, lewdness with a child, or an attempt or conspiracy to commit any of these offenses, so long as the offender was 14 years or older at the time of the offense. NRS 62F.200(1); NRS 179D.095(1)(b). The "term does not include an offense involving consensual sexual conduct if the victim was at least 13 years of age and the offender was not more than 4 years older than the victim at the time of the commission of the offense." NRS 62F.200(2).

Sex offenders are required to initially register before completing the term of imprisonment for a crime, or if not imprisoned, no later than three business days after sentencing. NRS 179D.445(2). They

must provide authorities with the following information: name, aliases, social security number, residence address, name and address of employer, name and address of school, and description and license plate number of all vehicles frequently driven or registered to them. NRS 179D.443(1). Any changes in name, residence, employment, or student status must be reported, in person, within three business days. NRS 179D.447(1). Failure to comply is a category D felony. NRS 179D.550(1).

Sex offenders are classified into three tiers; juvenile sex offenders can fall into any of these categories depending on their offense and prior history. Juveniles adjudicated for sexual assault, battery with the intent to commit sexual assault, or an attempt or conspiracy to commit these offenses are classified as Tier III offenders. *See* NRS 179D.117(2), (3) & (8). Juveniles can also be classified as Tier III offenders if they are already a Tier II offender and commit another sexual offense or crime against a child. NRS 179D.117(6). Juveniles adjudicated for lewdness with a child or attempted lewdness with a child are classified as Tier II offenders. *See* NRS 179D.115 (defining a Tier II offender as a person convicted of a crime against a child punishable by more than 1 year in prison); *see also* NRS 201.230 (lewdness is a category A felony); NRS 193.330(1)(a)(1) (attempt to commit a category A felony is a category B felony). Tier II assignment may also be made if a juvenile is already a Tier I offender and any of his "sexual offenses constitute an offense punishable by imprisonment for more than 1 year." NRS 179D.115(4). Finally, juveniles adjudicated for conspiracy to commit lewdness with a

child are Tier I offenders. *See* NRS 179D.113; *see also* NRS 193.140 (gross misdemeanor punishable by not more than one year in jail); NRS 199.480(3) (conspiracy is a gross misdemeanor).

Each tier has different reporting requirements. Tier III offenders must appear in person every 90 days and allow fingerprints, palm prints, and a photograph to be taken, and update any required information. NRS 179D.480(1)(c). Tier II offenders are required to appear in person every 180 days, and Tier I offenders once per year, for the same purpose. NRS 179D.480(1)(a)-(b). Tier III offenders must register for life; if, however, they are Tier III offenders as the result of a juvenile adjudication, they may petition for relief from the registration requirements after a period of 25 consecutive years without a conviction for a new felony or sexual offense, and successful completion of any probationary or parole terms and a certified sex offender treatment program. NRS 179D.490(2)-(4). Tier II offenders must register for 25 years and Tier I offenders for 15 years. NRS 179D.490(2)(a)-(b). Tier I offenders may, however, petition for release after 10 consecutive years if they meet the same requirements for early release as Tier III offenders. NRS 179D.490(3)(a). There is no early release provision for Tier II offenders.

Juvenile sex offenders are subject to both active and passive community notification. Local law enforcement agencies are required to provide registration information to (1) every school, religious and youth organization, and public housing agency in which the sex offender is a

student, worker, or resident; (2) every child welfare agency; (3) volunteer organizations through which contact with vulnerable persons or children may occur; and (4) if the sex offender is classified as a Tier III offender, members of the public likely to encounter the sex offender. NRS 179D.475(2). Further, any person, company, or organization may request registration information from the Central Repository for Nevada Records of Criminal History. NRS 179D.475(1)(e).

Juvenile sex offenders' information is also available via Nevada's community notification website. NRS 179B.250. Any member of the public may perform a search by name, alias, or zip code, yielding the following information about registered sex offenders: name and aliases; physical description; current photograph; year of birth; residence, school, and employer address; license plate number and description of any vehicle owned or operated by the sex offender; name of, and citation to, the specific statute violated; court convicted in; name convicted under; name and location of every penal institution, hospital, school, mental facility, or other institution committed to; location of offense committed; and assigned tier level. NRS 179B.250(6)(c). The website does not convey information regarding Tier I offenders unless they have been convicted of a sexual offense against a child or a crime against a child. NRS 179B.250(7)(b). It also does not reveal an offender's social security number, the name of an offender's school or employer, arrests not resulting in conviction, and any other registration information not expressly required to be disclosed by

paragraph (6)(c) or exempted from disclosure pursuant to federal law. NRS 179B.250(7)(c)-(g).

The public is prohibited from using information obtained from the community notification website, except as allowed by statute, "for any purpose related to" insurance; loans; credit; employment; education, scholarships, or fellowships; housing or accommodations; or benefits, privileges, or services from any business. NRS 179B.270. Neither may registration information "be used to unlawfully injure, harass or commit a crime against any person named in the registry or residing or working at any reported address." NRS 179B.250(2)(e). Misuse of information obtained from the website can result in civil and criminal penalties. NRS 179B.280; NRS 179B.285.

*The juvenile court's holding*

The juvenile court declared A.B. 579 unconstitutional as applied to juvenile sex offenders, concluding that the bill violated substantive due process because it neither bore a rational relationship to the public safety goals of the bill nor furthered the rehabilitation and public safety goals of the juvenile justice system.[2] The juvenile court's

---

[2]The juvenile court rejected Logan's contention that the bill should be reviewed under strict scrutiny, finding that it did not impinge upon any fundamental right or affect any suspect class. The juvenile court further rejected Logan's assertion that the bill violated the Contracts, Ex Post Facto, and Cruel and/or Unusual Punishment Clauses of the United States and Nevada Constitutions, as well as his contention that the bill

*continued on next page...*

primary concern with the bill was that it required community notification for all juvenile sex offenders over the age of 14 and adjudicated for certain offenses, regardless of their risk to reoffend, but did not allow community notification for those offenders under the age of 14, even those who represent a high risk to reoffend. We share the juvenile court's concerns regarding the wisdom of this legislation. Nevertheless, we are bound to follow the law, and A.B. 579, as applied to juveniles, easily passes rational basis review.

The constitutionality of a statute presents a question of law that this court reviews de novo. *State v. Hughes*, 127 Nev. ___, ___, 261 P.3d 1067, 1069 (2011). Statutes are cloaked with a presumption of validity and the burden is on the challenger to demonstrate that a statute is unconstitutional. *Id.* When undertaking a substantive due process analysis, a statute that does not infringe upon a fundamental right will be upheld if it is rationally related to a legitimate government purpose. *Bowers v. Whitman*, 671 F.3d 905, 916-17 (9th Cir.), *cert. denied*, 568 U.S. ___, 133 S. Ct. 163 (2012); *see also Gaines v. State*, 116 Nev. 359, 372, 998 P.2d 166, 174 (2000). The Legislature need not articulate its purpose in enacting a statute; the statute will be upheld if any set of facts can reasonably be conceived of to justify it. *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993); *Sereika v. State*, 114 Nev. 142, 149, 955

---

...*continued*
violated his right to procedural due process and was unconstitutionally vague.

P.2d 175, 179 (1998). A legislative choice "may be based on rational speculation unsupported by evidence or empirical data." *FCC*, 508 U.S. at 315. And the Legislature enjoys broad discretion to make reasonable distinctions when enacting legislation. *Allen v. State, Pub. Emps. Ret. Bd.*, 100 Nev. 130, 136-37, 676 P.2d 792, 796 (1984).

In line with the stated purpose of its federal counterpart, the Nevada Legislature could have determined that the enactment of A.B. 579 was required to protect the public from sex offenders, unquestionably a legitimate government interest. *See* 42 U.S.C. § 16901 (2006) (stating that the purpose of the act was "to protect the public from sex offenders and offenders against children"); *Nollette v. State*, 118 Nev. 341, 346, 46 P.3d 87, 90-91 (2002) (concluding that the purpose of Nevada's previous version of sex offender registration and community notification laws was to aid law enforcement in solving crimes and to protect the public). To this end, the Legislature could have determined that juveniles adjudicated for the enumerated offenses, which represent the most serious of sexual offenses, are at a higher risk to reoffend—and thus pose a greater danger to the public—than juveniles adjudicated for other, less serious offenses. *See Helman v. State*, 784 A.2d 1058, 1075 (Del. 2001). And consistent with the Legislature's presumption since 1911 that children aged 14 and older know the wrongfulness of their actions, *see* NRS 194.010(1)-(2) (unchanged since enactment in 1911, *see* Nev. Rev. Laws § 6268 (1912)), it could have also concluded that once a child reaches the age of 14, he or she commits a sex offense with knowledge that it is wrong and therefore poses a greater

risk to the public than a younger child who commits the same offense. Given these possible justifications for the distinctions drawn in the legislation, we conclude that the juvenile court erred by concluding that A.B. 579 did not survive rational basis review. *See United States v. Juvenile Male*, 670 F.3d 999, 1009-10 (9th Cir.) (application of SORNA to juvenile sex offenders satisfies rational basis review), *cert. denied*, 568 U.S. ___, 133 S. Ct. 234 (2012); *In re J.R.*, 793 N.E.2d 687, 694-96 (Ill. App. Ct. 2003) (registration and limited community notification as applied to juvenile sex offenders survive rational basis review); *In re Ronnie A.*, 585 S.E.2d 311, 312 (S.C. 2003) (registration of juvenile sex offenders is rationally related to goal of public protection); *In re M.A.H.*, 20 S.W.3d 860, 866 (Tex. App. 2000). *But see In re W.Z.*, 957 N.E.2d 367, 377 (Ohio Ct. App. 2011) (no rational basis for automatic registration of juvenile sex offenders at time of adjudication where, pursuant to state law, court made a determination as to rehabilitation when juvenile turned 21).

Of utmost concern, it does not appear from the legislative history that the Nevada Legislature ever considered the impact of this bill on juveniles or public safety. The body's motivation for passing the bill appears to be compliance with the Walsh Act and avoidance of the reduction in grant monies that would come with noncompliance. *See, e.g.*, Hearing on A.B. 579 Before the Assembly Select Comm. on Corrections, Parole, and Probation, 74th Leg. (Nev., April 10, 2007). Under rational basis review, however, we "are not limited to consideration of the justifications actually asserted by the legislature," *Sereika*, 114 Nev. at

149, 955 P.2d at 179; so long as plausible reasons for an action exist, it is "constitutionally irrelevant whether this reasoning in fact underlay the legislative decision," *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980) (internal quotation marks omitted); *see also Allen*, 100 Nev. at 134, 676 P.2d at 795 ("The existence of facts which would support the legislative judgment is presumed."). And "[t]his is particularly true where the legislature must necessarily engage in a process of line-drawing." *Fritz*, 449 U.S. at 179.

Our inquiry does not end, however, with our conclusion that the juvenile court erred by holding that A.B. 579 did not withstand rational basis review. If this court determines that the statutory scheme is unconstitutional for any other reason presented to the juvenile court, we will nevertheless uphold the order declaring the legislation unconstitutional. *Cf. Wyatt v. State*, 86 Nev. 294, 298, 468 P.2d 338, 341 (1970) ("If a judgment or order of a trial court reaches the right result, although it is based on an incorrect ground, the judgment or order will be affirmed on appeal."). We therefore examine Logan's other constitutional challenges.

*Substantive due process*

Logan contends that the community notification provisions of A.B. 579 impinge on juveniles' fundamental right to privacy and are therefore subject to strict scrutiny review. We disagree.

The substantive component of the Fourteenth Amendment to the United States Constitution recognizes certain "fundamental rights"

upon which the government's ability to intrude is sharply limited. *See, e.g., Paul v. Davis*, 424 U.S. 693, 712-13 (1976). A substantive due process analysis begins "with a careful description of the asserted right." *Reno v. Flores*, 507 U.S. 292, 302 (1993). If the asserted right is "deeply rooted" in tradition and history and so "implicit in the concept of ordered liberty" that "neither liberty nor justice would exist if [it] were sacrificed," the asserted right is a fundamental one. *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (internal quotation marks omitted); *see also Palko v. Connecticut*, 302 U.S. 319, 325-26 (1937), *overruled on other grounds by Benton v. Maryland*, 395 U.S. 784, 794 (1969). A statute that infringes on a fundamental right is subject to strict scrutiny and will be invalidated unless it is "narrowly tailored to serve a compelling state interest." *In re Parental Rights as to D.R.H.*, 120 Nev. 422, 427, 92 P.3d 1230, 1233 (2004) (internal quotation marks omitted). If the statute does not abridge a fundamental right, it is reviewed under the rational basis test and will be upheld so long as it bears a rational relationship to a legitimate state interest. *See Allen*, 100 Nev. at 134, 676 P.2d at 794-95.

Logan contends that "[a]n individual's right to privacy is clearly impacted by community notification." Besides this vague reference to the right of privacy, he fails to identify the precise right asserted. Because Logan challenges the community notification provisions of A.B. 579, we conclude that his claim is appropriately stated as the right to have records of juvenile adjudications for sex offenses kept confidential. We further conclude that this is not a fundamental right protected by the

substantive component of the Fourteenth Amendment of the United States Constitution, *see* U.S. Const. amend. XIV, § 1, or the due process clause of the Nevada Constitution, *see* Nev. Const. art. 1, § 8(5).

The Supreme Court has identified fundamental rights as including "the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion." *Glucksberg*, 521 U.S. at 720 (internal citations omitted). Also included may be the right to "refuse unwanted lifesaving medical treatment." *Id.* This court has consistently relied upon the Supreme Court's holdings interpreting the federal Due Process Clause to define the fundamental liberties protected under Nevada's due process clause. *See, e.g., Arata v. Faubion*, 123 Nev. 153, 158-59, 161 P.3d 244, 248-49 (2007); *Kirkpatrick v. Eighth Judicial Dist. Court*, 119 Nev. 66, 71, 64 P.3d 1056, 1059-60 (2003).

We conclude that Logan's asserted right, while unquestionably important, does not come within the ambit of the type of rights deemed fundamental by the Supreme Court. Other courts have reached the same conclusion. *See, e.g., Doe v. Mich. Dep't of State Police*, 490 F.3d 491, 500 (6th Cir. 2007); *Juvenile Male*, 670 F.3d at 1012-13; *In re J.W.*, 787 N.E.2d 747, 757 (Ill. 2003); *Helman*, 784 A.2d at 1073-74 (rejecting juvenile sex offender's contention that community notification violated his right to privacy); *In re Jeremy P.*, 692 N.W.2d 311, 319-20 (Wis. Ct. App. 2004); *see also Glucksberg*, 521 U.S. at 720 (cautioning that the Supreme Court has "always been reluctant to expand the concept of substantive due process

because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended" (internal quotation marks omitted)). *But see State v. Bani*, 36 P.3d 1255, 1264-66 (Haw. 2001).

Neither is the right to the confidentiality of juvenile sex offender records so "deeply rooted" in Nevada's history as to render confidentiality a fundamental right under our state constitution. Juvenile delinquency records have historically enjoyed general confidentiality in this state. *See, e.g.*, NRS 62H.030(2) (records of juvenile offenders can generally be opened to the public only through court order to those persons with a legitimate interest in the records); NRS 62H.130 (most juvenile delinquents adjudicated for nonsexual offenses may move to seal their records three years after an adjudication, if they remain trouble-free).

Records of juvenile sex offenders, however, have enjoyed less protection than records of other delinquents. Persons subject to juvenile community notification, or adult community notification pursuant to delinquency adjudications, were not eligible to seal their delinquency records. 2003 Nev. Stat., ch. 206, § 192, at 1082. Most significantly, from 1997 until the effective date of A.B. 579 in 2008, juvenile sex offenders were subject to juvenile community notification, 1997 Nev. Stat., ch. 451, § 90.8, at 1675 (repealed by A.B. 579), which entailed almost the identical community notification provisions as the adult version, *compare* Office of the Nev. Attorney Gen., *Nevada's Guidelines and Procedures for Community Notification of Juvenile Sex Offenders*, § 8.10, at 10 (Rev. Feb. 2006) [hereinafter *Juvenile Community Notification Guidelines*], *with*

Office of the Nev. Attorney Gen., *Nevada's Guidelines and Procedures for Community Notification of Adult Sex Offenders*, § 8.10, at 12 (Rev. Feb. 2006). Juvenile community notification included distribution of a juvenile sex offender's photograph, a description of his person, his name and aliases, a general location of his residence and workplace, and a description and license number of all vehicles he owned or regularly operated. *Juvenile Community Notification Guidelines, supra*, § 8.10(2). If designated as a Tier II offender, law enforcement was required to provide this information to any camps, school districts, youth organizations, day care centers, and other religious or community organizations deemed reasonably likely to encounter the juvenile. *Id.* § 8.00(3). In addition, if a Tier II juvenile offender was adjudicated for a sexual offense against a person under 18 years of age—as it appears many juvenile sex offenders were—law enforcement was also required to notify movie theaters and businesses catering primarily to children and that were reasonably likely to encounter the juvenile offender. *Id.* Records of Tier III juvenile sex offenders were even more broadly publicized; law enforcement was required to notify, in addition to the notification required for Tier II offenders, any members of the community that were reasonably likely to encounter the juvenile sex offenders and who, in law enforcement's discretion, were appropriate persons to receive notification.[3]

---

[3]For Tier I offenders, the information was disseminated only to law enforcement agencies. *Juvenile Community Notification Guidelines, supra*, § 8.00(2).

*Id.* § 8.00(4). And the juvenile court was vested with the discretion to require juvenile sex offenders to register as adult sex offenders and submit to adult community notification. 2005 Nev. Stat., ch. 507, § 26, at 2873-74. Accordingly, no deeply rooted right to the confidentiality of juvenile sex offender records exists in Nevada.

We conclude that Logan fails to demonstrate that A.B. 579 implicates a fundamental right. The bill is therefore reviewed under the rational basis test, which, as discussed above, it passes. Logan's contention that A.B. 579, as applied to juveniles, violates substantive due process lacks merit.[4]

*Procedural due process*

Logan contends that A.B. 579 denies him procedural due process because it deprives him of a protected privacy interest without procedural protections. We disagree. A.B. 579 imposes registration and

---

[4]We also reject Logan's assertion that placing juvenile sex offenders "in the same category as adult sex offenders" violates his right to equal protection. Neither age nor classification as a sex offender constitutes a suspect classification for purposes of an equal protection analysis. *See Gregory v. Ashcroft*, 501 U.S. 452, 470 (1991); *Juvenile Male*, 670 F.3d at 1009; *Doe v. Michigan Dep't of State Police*, 490 F.3d 491, 503 (6th Cir. 2007); *Doe v. Moore*, 410 F.3d 1337, 1346 (11th Cir. 2005); *United States v. LeMay*, 260 F.3d 1018, 1030 (9th Cir. 2001); *In re M.A.H.*, 20 S.W.3d 860, 866 (Tex. App. 2000) (declining to apply strict scrutiny where neither juveniles nor sex offenders constituted a suspect class); *State v. Ward*, 869 P.2d 1062, 1077 (Wash. 1994); *State v. Linssen*, 126 P.3d 1287, 1290 (Wash. Ct. App. 2006). Thus, A.B. 579 is subject only to rational basis review. As discussed above, A.B. 579 withstands rational basis review.

community notification requirements on all juveniles age 14 and older who are adjudicated for certain crimes; no additional facts are relevant to the statutory scheme. Even assuming A.B. 579 infringes on a liberty interest, Logan is not entitled to procedural due process to prove a fact that is irrelevant under the statute. *See Connecticut Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 7 (2003) ("[E]ven assuming, *arguendo*, that respondent has been deprived of a liberty interest, due process does not entitle him to a hearing to establish a fact that is not material under the . . . statute."). *But see State v. Guidry*, 96 P.3d 242, 251-52 (Haw. 2004) (concluding that due process clause of state constitution required a hearing to determine risk of future dangerousness because, although statute required imposition of registration on all sex offenders, future dangerousness was relevant to the statutory scheme because its purpose was to protect the public); *In re W.Z.*, 957 N.E.2d 367, 377-80 (Ohio Ct. App. 2011) (concluding that fundamental fairness requires a hearing to determine whether a juvenile sex offender has been rehabilitated before he may be subjected to registration and community notification where statute was based solely on the offense committed).

*Vagueness*

Logan contends that the statutory scheme is unconstitutionally vague because it grants the juvenile court continuing jurisdiction over juvenile sex offenders and defines them as children for 25 years to a lifetime. He points out that a "child" is defined as a person who is subject to the jurisdiction of the juvenile court as a juvenile sex offender

pursuant to NRS 62F.200-.260. NRS 62A.030(1)(c). However, the juvenile court cannot end its jurisdiction over a child for the purpose of carrying out the provisions of NRS 62F.200-.260 until the child is no longer subject to registration and community notification as a juvenile sex offender, *see* NRS 62F.220(2), and there is no provision allowing the juvenile court to relieve a child of registration and community notification. Logan contends that this statutory framework raises many questions relating to the scope of the jurisdiction of the juvenile court, which court has jurisdiction over violations of the registration statute and the supervision of parole and probation, and the ramifications of being defined as a child for a lifetime. This vagueness argument was not made to the juvenile court in Logan's motion to declare A.B. 579 unconstitutional.[5] *See McKay v. City of Las Vegas*, 106 Nev. 203, 207, 789 P.2d 584, 586 (1990) (declining to consider issue not litigated before or ruled upon by the district court), *overruled on other grounds by Salaiscooper v. Eighth Judicial Dist. Court*, 117 Nev. 892, 34 P.3d 509 (2001). Nevertheless, we exercise our discretion to address this issue.

A statute is unconstitutionally vague if it is "'so standardless that it authorizes or encourages seriously discriminatory enforcement.'"

---

[5]Logan made a vagueness argument to the juvenile court relying upon the same statutory provisions, but contended that the statutory scheme was vague because it failed to clarify which governmental entity had jurisdiction to enforce lifetime supervision and the restrictions imposed by Senate Bill 471, which was passed during the 2007 legislative session.

*Ford v. State*, 127 Nev. ___, ___, 262 P.3d 1123, 1125 (2011) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)). To survive a vagueness challenge, a "law must . . . provide explicit standards for those who apply them" and give persons "of ordinary intelligence a reasonable opportunity to know what is prohibited." *In re T.R.*, 119 Nev. 646, 653, 80 P.3d 1276, 1280-81 (2003) (internal citation omitted). The burden to demonstrate a statute's unconstitutionality rests on the challenger. *Ford*, 127 Nev. at ___, 262 P.3d at 1126.

We conclude that Logan fails to demonstrate that AB. 579 is unconstitutionally vague. NRS 62F.220(2) does appear, as Logan asserts, to give the juvenile court continuing jurisdiction over juvenile sex offenders.[6] The plain language of the statute, however, limits the purpose of the continuing jurisdiction to "carrying out the provisions of" NRS 62F.200-.260. These statutes provide, respectively, the definition of a sexual offense; the juvenile court's duty to inform the Central Repository, the child, and the child's parent or guardian that a juvenile sex offender is subject to registration and community notification; and that the juvenile

---

[6]This conclusion does not conflict with this court's recent statement in *State v. Barren*, 128 Nev. ___, ___, 279 P.3d 182, 187 (2012), that the "juvenile court's jurisdiction [is limited] to persons less than 21 years of age." *Barren* dealt with the juvenile court's jurisdiction to adjudicate juveniles pursuant to the general rule of NRS 62B.410, while the portions of the statutes at issue here deal with the juvenile court's limited continuing jurisdiction to engage in administrative functions relating to registration and community notification pursuant to the exception in NRS 62B.410.

court may not seal a juvenile sex offender's records so long as he or she is subject to registration and community notification. Read in conjunction with NRS 62F.200-.260, NRS 62F.220(2) provides the juvenile court with continuing jurisdiction over juvenile sex offenders only so that it may provide information to the Central Repository and parents or guardians of juvenile sex offenders, and to keep records from being sealed. Accordingly, Logan fails to demonstrate that NRS 62F.220(2) determines which court has jurisdiction over a violation of the registration requirements of Chapter 179D, *see* NRS 179D.550 (providing a criminal penalty for any sex offender who fails to comply with the provisions of NRS Chapter 179D), or affects the juvenile court's jurisdiction over delinquents who are on juvenile parole or probation.

Logan also points out that, pursuant to NRS 62A.030(1)(c)— defining a "child"—a juvenile sex offender could be defined as a child for a lifetime. Although he complains that being defined as a child for a lifetime may have some impact on individuals in the "sunset years of their lives," he does not identify any vagueness in the statute itself. Therefore, we conclude that Logan fails to demonstrate any constitutional infirmity in this regard.

*Statutory conflict*

Next, Logan points to an alleged conflict between A.B. 579 and the existing statutory scheme, asserts that the rule of lenity should apply, and contends that A.B. 579 should therefore be interpreted to mean that registration and community notification are not applicable to juvenile sex

offenders. Specifically, NRS 169.025(2) provides that NRS Title 14, which includes NRS Chapters 169 through 189, does not apply to juvenile delinquency proceedings. A.B. 579, however, requires that juveniles adjudicated of sex offenses submit to registration and community notification pursuant to NRS 179D.010-.550. Despite Logan's failure to present this argument to the juvenile court, we elect to address it. We conclude that this contention lacks merit because the cited statutory provisions can be read in harmony; when so read, registration and community notification do apply to juveniles and the rule of lenity does not apply.

When two statutory provisions conflict, this court employs the rules of statutory construction, *Williams v. Clark Cnty. Dist. Attorney*, 118 Nev. 473, 484, 50 P.3d 536, 543 (2002), and attempts to harmonize conflicting provisions so that the act as a whole is given effect, *In re Eric L.*, 123 Nev. 26, 31, 153 P.3d 32, 35 (2007). Statutes are interpreted so that each part has meaning. *Leven v. Frey*, 123 Nev. 399, 405, 168 P.3d 712, 716 (2007). Therefore, when a scheme contains a general prohibition contradicted by a specific permission, "the specific provision is construed as an exception to the general one." *RadLAX Gateway Hotel, L.L.C. v. Amalgamated Bank*, 566 U.S. ___, ___, 132 S. Ct. 2065, 2071 (2012).

Here, NRS 169.025(2) is a general prohibition, preventing application of Title 14, including Chapter 179D, to juvenile delinquency proceedings. On the other hand, NRS Chapter 179D contains specific provisions mandating its application to certain juveniles adjudicated

delinquent—NRS 179D.035 defines "convicted" to include certain delinquency adjudications and NRS 179D.095 defines "sex offender" to include certain juveniles adjudicated delinquent. The rules of statutory construction dictate that the specific provisions of NRS Chapter 179D be construed as exceptions to the general prohibition of NRS 169.025(2). *See also A Minor v. Juvenile Dep't*, 96 Nev. 485, 611 P.2d 624 (1980) (NRS 169.025(2) does not forbid application of rules of criminal procedure to juvenile proceedings). So read, the provisions are in harmony and none are rendered meaningless. And because they can be read in harmony, the rule of lenity does not apply. *State v. Lucero*, 127 Nev. ___, ___, 249 P.3d 1226, 1230 (2011) (the rule of lenity applies only when the other rules of statutory interpretation fail).

*Conflict with purpose of juvenile justice system*

Logan asserts that registration and community notification and the resulting stigmatization of juveniles conflicts with the traditional goals of the juvenile justice system. We recognize that community notification can have lasting stigmatic effects on juvenile offenders. Logan's argument, however, relies upon an erroneous factual assumption.

From their beginnings in 1899 in Illinois, juvenile courts focused only on the best interest of the child, treating delinquents not as criminals, "but as misdirected, and misguided and needing aid, encouragement and assistance." *In re Seven Minors*, 99 Nev. 427, 431-32, 664 P.2d 947, 950 (1983) (internal quotation marks omitted), *disapproved on other grounds as stated in In re William S.*, 122 Nev. 432, 442 n.23, 132

P.3d 1015, 1021 n.23 (2006). But in 1949, Nevada's Legislature broadened this focus by requiring Nevada's juvenile courts to consider the public interest (including public protection) as well as the best interest of the child. *See id.* at 431-33, 664 P.2d at 950-51. Since then, we have specifically noted that public protection and the best interest of the child sometimes conflict, and concluded that when they do, it is the public interest that should predominate. *Id.* at 433, 664 P.2d at 951. Thus, while the interest of the juvenile offender remains one of the central concerns of the juvenile system, it is no longer the only, or primary concern. Accordingly, based on Nevada's long-standing recognition of public protection as one of the dual interests of the juvenile system, we conclude that registration and community notification do not inherently conflict with the purposes of Nevada's juvenile justice system.

Other courts have reached analogous conclusions. For example, the Supreme Court of Illinois determined that, given the recent expansion in the purpose of the juvenile court to include public protection and juvenile accountability, requiring juvenile sex offenders to register for life and subjecting them to limited community notification was not at odds with the policy and purpose of its juvenile system. *In re J.W.*, 787 N.E.2d 747, 759 (Ill. 2003); *see also Juvenile Male*, 670 F.3d at 1008 (although SORNA's notification requirement conflicted with the confidentiality provisions of the Federal Juvenile Delinquency Act, Congress clearly intended to limit those confidentiality provisions); *In re Richard A.*, 946 A.2d 204, 212 (R.I. 2008) (noting that the confidentiality generally

afforded juveniles is not absolute and must sometimes give way to other legitimate public policies). *But see In re W.Z.*, 957 N.E.2d 367, 376 (Ohio Ct. App. 2011) (community notification "obscures the foundational principles upon which the juvenile justice system was built").

*Ex post facto*

Logan contends that retroactive application of A.B. 579 to juvenile sex offenders violates the Ex Post Facto Clauses of the United States and Nevada Constitutions. We conclude that Logan fails to demonstrate that retroactive application of the legislation is unconstitutional.

Both the federal and state constitutions prohibit the passage of ex post facto laws. U.S. Const. art. I, § 10; Nev. Const. art. 1, § 15. This prohibition forbids the passage of laws that impose punishments for acts that were not punishable at the time they were committed or impose punishments in addition to those prescribed at the time of the offense. *Weaver v. Graham*, 450 U.S. 24, 28 (1981). Accordingly, to be ex post facto, a law must both operate retrospectively and disadvantage the person affected by it by either changing the definition of criminal conduct or imposing additional punishment for such conduct. *Id.*

For purposes of ex post facto analysis, a retrospective law is one that "changes the legal consequences of acts completed before its effective date." *Id.* at 31. A.B. 579 clearly operates retrospectively because it imposes consequences for conduct occurring before its effective date. *See* NRS 179D.095(1)(b) (defining a "sex offender" as a person who

has been adjudicated for a sex offense after July 1, 1956). A.B. 579 does not alter the definition of any crime, or, in this case, delinquent act. Therefore, whether the bill is an ex post facto law hinges on whether it imposes an additional punishment for a past delinquent act.

A two-part test is utilized to determine whether a given statute imposes a punishment. *See, e.g., Smith v. Doe*, 538 U.S. 84, 92 (2003). First, we must determine legislative intent. *See id.* If the intent was to impose a punishment, the statute is a punishment. *See id.* If, however, the intention of the Legislature was to create a civil, nonpunitive regulatory scheme, we must determine whether the statutory scheme is "so punitive either in purpose or effect as to negate the State's intention to deem it civil." *Id.* (internal quotation marks and brackets omitted).

*Legislative intent*

Logan baldly states that the legislative intent behind A.B. 579 was punitive, but does not support this assertion with any cogent argument or citation to authority or legislative history. The intent of Nevada's prior version of the sex offender registration and community notification scheme was to create a civil regulatory scheme. *Nollette v. State*, 118 Nev. 341, 346, 46 P.3d 87, 91 (2002). And the legislative history indicates that the only intent behind the current version of the scheme was compliance with SORNA in order to avoid the loss of federal funds. As such, Logan has failed to demonstrate that the Legislature intended A.B. 579 to be anything other than a civil regulatory scheme. Therefore, we must proceed to consider whether the effects of A.B. 579 are so

punitive in "effect as to negate the State's intention to deem it civil." *Smith*, 538 U.S. at 92 (internal quotation marks and brackets omitted).

*Effect of A.B. 579*

Seven factors are considered when analyzing the effects of challenged provisions: whether the statutory scheme (1) has traditionally been regarded as punishment, (2) imposes an affirmative disability or restraint, (3) promotes the traditional goals of punishment, (4) is rationally related to a nonpunitive purpose, (5) is excessive in relation to its nonpunitive purpose, (6) applies only upon a finding of scienter, and (7) applies to behavior that is already a crime. *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963); *see also Smith*, 538 U.S. at 97-106 (applying *Mendoza-Martinez* factors to determine effect of state sex offender registration scheme); *Palmer v. State*, 118 Nev. 823, 829, 59 P.3d 1192, 1196 (2002); *Nollette*, 118 Nev. at 346-47, 46 P.3d at 91. Because the Legislature's intent is given deference, "only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Smith*, 538 U.S. at 92 (internal quotation marks omitted); *Desimone v. State*, 116 Nev. 195, 199-205, 996 P.2d 405, 407-11 (2000) (applying the "clearest proof" test to determine whether tax was punitive in effect despite contrary legislative intent); *State v. Lomas*, 114 Nev. 313, 317-18, 955 P.2d 678, 680-81 (1998) (applying the "clearest proof" standard in determining whether driver's license revocation is so punitive in effect as to override legislative intent).

The seminal case applying the *Mendoza-Martinez* factors to sex offender registration and notification laws is *Smith v. Doe*, 538 U.S. 84 (2003). The legislation at issue there imposed retroactive registration requirements and community notification provisions on convicted sex offenders. *Smith*, 538 U.S. at 90. It required offenders to register with local authorities, provide certain personal information, and allow the authorities to fingerprint and photograph them. *Id.* Depending on the number of prior convictions and nature of the current offense, offenders were required to update their registration information either annually for a period of 15 years, or quarterly for life. *Id.* Noncompliance subjected offenders to criminal prosecution. *Id.* A sex offender's name, aliases, date of birth, physical description, photograph, address, place of employment, motor vehicle license and identification numbers, crime convicted of, date, place, court of conviction, and other information were made available to the public on the Internet. *Id.* at 91. The majority in *Smith* concluded that the effects of the challenged legislation did not negate the legislature's intent to establish a civil regulatory scheme. *Id.* at 105-06.

Applying the *Mendoza-Martinez* factors to A.B. 579, we conclude that Logan has failed to demonstrate, by the clearest proof, that its effect negates the Legislature's intent to create a civil regulatory scheme. An analysis of each factor follows.

*Historical form of punishment*

The first factor is whether registration and community notification have historically been regarded as punishments. *Id.* at 97.

Logan asserts that registration and community notification are analogous to the historical punishments of branding and placing criminals in stocks. The Supreme Court, however, rejected this exact argument as applied to adult offenders in *Smith*, concluding that, unlike historical punishments, publicity and stigma are not "an integral part of the objective of the regulatory scheme." 538 U.S. at 99. And Logan does not distinguish *Smith*'s holding in this regard as applied to juveniles.[7]

Logan also points to the Ninth Circuit's decision in *United States v. Juvenile Male*, 581 F.3d 977, 989 (9th Cir. 2009), wherein the court concluded that publication of a juvenile's delinquency adjudication was a historical form of punishment because information about juvenile offenses was historically only publicized after a juvenile was transferred to adult court for punitive purposes. The opinion in *Juvenile Male* has since been vacated. *United States v. Juvenile Male*, 564 U.S. ___, 131 S. Ct. 2860 (2011). Further, the factual basis for the reasoning in *Juvenile Male* does not exist in Nevada; as discussed above, juvenile sex offender records had been subject to community notification for over a decade before A.B. 579, even when cases had not been transferred to adult court.

Finally, we note that registration and community notification requirements are of recent origin and cannot be considered a historical

---

[7]To the extent Logan asserts that the juvenile court's continued jurisdiction over juvenile sex offenders constitutes a historical form of punishment because it is analogous to lifetime supervision, we conclude this assertion lacks merit. *Cf. Smith*, 538 U.S. at 101-02.

SUPREME COURT
OF
NEVADA

(O) 1947A

form of punishment. *See Smith,* 538 U.S. at 97. We conclude this factor therefore weighs in favor of the conclusion that A.B. 579 is not a punishment.

*Affirmative disability or restraint*

Next, we consider whether A.B. 579 imposes an affirmative disability or restraint. *Smith,* 538 U.S. at 97. When inquiring into this factor, we examine the legislation's effect on those subject to it. *Id.* at 99-100.

Logan contends that the registration requirement imposes an affirmative disability or restraint because it requires offenders to physically appear several times per year to register. This contention is foreclosed by our decision in *Nollette,* where we implicitly rejected this contention by concluding that the earlier version of Nevada's registration and community notification provisions "do[es] not place an affirmative disability or restraint on the sex offender." *Nollette,* 118 Nev. at 346, 46 P.3d at 91. The provisions under consideration in *Nollette,* like those challenged here, also required sex offenders to periodically appear in person to update their registration information. *Id.* at 345, 46 P.3d at 90. And to the extent Logan relies on *Smith* for the proposition that an in-person registration requirement imposes an affirmative disability or restraint, that reliance is misplaced because the Supreme Court merely noted the lower court's erroneous determination that the challenged statute contained an in-person registration requirement and did not decide whether such a requirement constituted an affirmative disability.

*Smith*, 538 U.S. at 101; *see ACLU of Nev. v. Masto*, 670 F.3d 1046, 1056 (9th Cir. 2012) (the Supreme Court's resolution of a factual error in *Smith* was not a holding that the in-person registration requirement was an affirmative disability).

Logan also asserts that the holdings of *Smith* and *Nollette*—which are based in part on the fact that convictions are a matter of public record—cannot be applied to juvenile offenders whose records of adjudication are not matters of public record. Although the question is close, we disagree for two reasons.

First, juvenile sex offender records were available to the public prior to A.B. 579. As previously discussed, law enforcement was required to disclose some records to certain members of the public via juvenile community notification. And the juvenile court was empowered to allow inspection of unsealed records by any person with "a legitimate interest in the records." NRS 62H.030(2); NRS 62H.170(1). Thus, juvenile sex offender records were available to the public, albeit in limited circumstances, prior to A.B. 579. *See United States v. W.B.H.*, 664 F.3d 848, 856 (11th Cir. 2011) (rejecting juvenile's attempt to distinguish *Smith* based on the fact that juvenile records are not a matter of public record where juvenile court had discretion to permit inspection of the records), *cert. denied*, 568 U.S. ___, 133 S. Ct. 524 (2012).

Second, A.B. 579 itself does not impose an affirmative disability or restraint on juvenile sex offenders. We are fully aware that to the extent juvenile sex offender records were not previously accessible to

the public, some negative consequences to juveniles almost certainly result from A.B. 579's community notification provisions. Nevertheless, the notification provisions themselves do not impose any negative consequences; those consequences result indirectly from the public's response to knowledge of the adjudication. *See W.B.H.*, 664 F.3d at 856 & 857 n.5 (any negative consequences resulting from community notification are "collateral consequence[s] of a legitimate regulation" (citing *Smith*, 538 U.S. at 99)). *But see State v. C.M.*, 746 So. 2d 410, 418 (Ala. Crim. App. 1999) (finding that subjecting juvenile sex offenders to registration and community notification imposed an affirmative disability or restraint in part because it exposed previously confidential adjudication records to public). And because the statutory scheme expressly prohibits the use of information obtained from the community notification website to discriminate, imposition of such disabilities by the community is also illegal. *See* NRS 179B.250(2)(e); NRS 179B.270; NRS 179B.280; NRS 179B.285; NRS 179B.290. We conclude that A.B. 579 does not impose an affirmative disability or restraint on juvenile sex offenders and this factor weighs in favor of a finding that the statutory scheme does not impose a punishment.

*Traditional aims of punishment*

Next, this court must consider whether registration and community notification promote the traditional aims of punishment. *Smith*, 538 U.S. at 97. Logan points out that in *Nollette*, this court acknowledged the possibility that registration could have a deterrent

effect but determined that, "without more," that possibility did not render the statute punitive. *See Nollette*, 118 Nev. at 347, 46 P.3d at 91. Something "more" is present, he asserts, when the statutes are applied to juveniles.

First, Logan asserts that A.B. 579 is punitive in effect as applied to juveniles because juvenile offenders are assigned to a tier based on the offense committed rather than their individual risk to reoffend. The *Smith* Court rejected the argument that the Alaska statute was excessive because it applied to all offenders regardless of risk of recidivism. 538 U.S at 104. The Supreme Court also rejected the argument that the statutory scheme was retributive because it based the length of the registration period on an offender's crime rather than on his risk of recidivism, concluding that the use of broad categories to determine the length of the registration period was "consistent with the regulatory objective." *Id.* at 102. Like the scheme at issue in *Smith*, we conclude that Nevada's scheme of offense-based tiering is consistent with the statute's goal of protecting the public from recidivist juveniles;[8] it is reasonable to conclude that juvenile offenders who have committed the most severe offenses pose the greatest risk to the public.[9]

_____

[8]Whether risk-based tiering would be a more effective means of protecting the public is beyond the scope of an ex post facto analysis. *See infra* at 37.

[9]Relatedly, Logan implies that the statute is retributive because it requires all sex offenders who have been convicted of a crime against a

*continued on next page...*

Second, Logan notes that offenders are subject to prosecution for failure to comply with the registration requirements. He does not explain how this fact serves a traditional aim of punishment. The *Smith* Court considered the criminal penalty in regard to whether the Alaska scheme imposed an affirmative disability or restraint and rejected the contention, concluding that any prosecution resulting from failure to comply with reporting requirements was separate from the original offense. *Smith*, 538 U.S. at 101-02. Logan does not acknowledge this holding in *Smith* or attempt to distinguish it as applied to juvenile offenders.[10] We conclude that Logan fails to demonstrate that A.B. 579 promotes a traditional aim of punishment as applied to juvenile sex

---

*...continued*

child under the age of 18, which includes nearly all juvenile sex offenders, to register. We decline to consider this assertion because it is not supported by any cogent argument. *See Maresca v. State*, 103 Nev. 669, 673, 748 P.2d 3, 6 (1987). For the same reason, we decline to consider his assertion that imposition of adult registration and community notification is punitive because the restraint on his liberty "is increased from a period of approximately 3 years to a lifetime." *See also Smith*, 538 U.S. at 104.

[10]This court also implicitly rejected this argument in *Nollette*. The statutory scheme under review there provided that noncompliance with the registration provisions constituted a felony offense. *Nollette*, 118 Nev. at 345, 46 P.3d at 90. The court did not specifically discuss that provision, but did not conclude that the statutory scheme served a traditional aim of punishment or weighed in favor of a finding that the scheme was punitive. *Id.* at 346-47, 46 P.3d at 91.

offenders and this factor therefore weighs in favor of a finding that the bill is not punitive.

*Rational connection to a nonpunitive purpose*

The next factor is whether A.B. 579 is rationally related to a nonpunitive purpose. Logan asserts that the statutory scheme "cannot be reconciled with any legitimate public purpose" and is irrational because it is not the most cost-effective means to protect the public. We disagree.

Subjecting juvenile sex offenders to registration and community notification has the legitimate, nonpunitive purpose of protecting the public. *See United States v. Salerno*, 481 U.S. 739, 747 (1987) (public protection is a legitimate regulatory purpose). This purpose is furthered by notifying the community of the presence of juvenile sex offenders so that it may take any protective, nondiscriminatory actions deemed necessary. *See Juvenile Male*, 670 F.3d at 1010-11 (registration and community notification of juvenile sex offenders satisfies rational basis review); *W.B.H.*, 664 F.3d at 859; *see also Doe v. State*, 189 P.3d 999, 1015 (Alaska 2008) (considering statutes as applied to adult offenders); *accord Helman v. State*, 784 A.2d 1058, 1075 (Del. 2001). And the fact that the chosen method is not the most cost-effective does not render it irrational. *See Smith*, 538 U.S. at 103 ("A statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aim it seeks to advance.").

Because the *Smith* Court stated that a rational connection to a nonpunitive purpose "is a [m]ost significant" factor, *id.* at 102 (alteration

in original) (internal quotation marks omitted), this factor weighs heavily in favor of a finding that the effect of the challenged legislation is not punitive.

*Excessiveness*

The fifth factor to consider is whether A.B. 579 is excessive in relation to its nonpunitive purpose. *See Smith*, 538 U.S. at 97. The inquiry into whether a statutory scheme is excessive in relation to its regulatory purpose "is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy. The question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective." *Id.* at 105.

Logan contends that A.B. 579 is excessive in relation to its stated purpose because it does not take into consideration juveniles' low recidivism rates and is not cost-effective.[11]

*Recividism*

Logan cites to the Supreme Court's conclusion in *Smith* that the Alaska statutory scheme was not excessive because the legislature could have reasonably concluded that sex offenders posed a substantial risk to reoffend. Logan then points to research indicating that the rate of recidivism for juvenile sex offenders is low. According to the literature cited by Logan,

---

[11]Logan also asserts that the statutory scheme conflicts with the purpose of the juvenile court system. He does not provide any argument tying the alleged conflict to the excessiveness of the bill. As discussed above, the imposition of registration and community notification does not conflict with the purpose of Nevada's juvenile justice system.

juvenile sex offenders are highly amenable to treatment and have low rates of recidivism. *See* Justice Policy Institute, *Youth Who Commit Sex Offenses: Facts and Fiction, available at* http://www.justicepolicy.org/uploads/justicepolicy/documents/08-08_fac_sornafactfiction_jj.pdf; Justice Policy Institute, *The Negative Impact of Registries on Youth: Why are Youth Different from Adults?, available at* http://www.justicepolicy.org/uploads/justicepolicy/documents/08-08_fac_sornakidsaredifferent_jj.pdf. The sources cited by Logan, however, indicate that juvenile sex offenders have between a 1.7 and 18 percent chance of conviction for another sex offense. *See also* Center for Sex Offender Management, *Recidivism of Sex Offenders* (May 2001), *available at* http://www.csom.org/pubs/recidsexof.html (noting a 13-percent base rate of overall recidivism for sex offenders but that results differ across studies); Center for Sex Offender Management, *Frequently Asked Questions About Sexual Assault and Sex Offenders*, http://www.csom.org/faq/index.html (last visited May 16, 2012) (reoffense rates for juvenile sex offenders are approximately 12 to 24 percent).

Logan does not provide any statistics regarding recidivism rates for adult sex offenders. This court's own limited research indicates that adult sex offenders have similar rates of recidivism. *See Recidivism of Sex Offenders, supra* (noting a 13-percent base rate of overall recidivism for sex offenders but that results differ across studies); Texas Department of Health and Human Services, Council on Sex Offender Treatment, *Treatment of Sex Offenders—Recidivism, available at* http://www.dshs.state.tx.us/csot/csot_trecidivism.shtm (last updated April 30, 2012) (average 13-percent recidivism rate for adult offenders); State of Connecticut, Office of Policy

and Management, Criminal Justice Policy & Planning Division, *Recidivism among Sex Offenders in Connecticut* (Feb. 15, 2012), *available at* http://www.ct.gov/opm/lib/opm/cjppd/cjresearch/recidivismstudy/sex_offender_recidivism_2012_final.pdf (sex offenders have 3.6-percent arrest rate for new sex-related charges). And the State points to authority stating that research into the rates of juvenile sex offender recidivism is less than comprehensive. *See* Center for Sex Offender management, *Recidivism of Sex Offenders* (May 2001), *available at* http://www.csom.org/pubs/recidsexof.html; *see also* NRS 62H.300(2) (recognizing the need for greater statistical analysis regarding recidivism rates of juvenile sex offenders).

Even assuming that juveniles do have lower recidivism rates than adults, the *Smith* Court flatly rejected the argument that application of registration and notification requirements to an entire class of sex offenders, rather than only to those offenders who posed the highest risk to reoffend, rendered the scheme excessive in scope. *Smith*, 538 U.S. at 104. We conclude that Logan fails to demonstrate that the difference in recidivism rates is so great as to render the Legislature's concern with recidivism of juvenile sex offenders unreasonable. *See W.B.H.*, 664 F.3d at 860 (rejecting argument that lower rates of recidivism for juvenile sex offenders as compared to adult sex offenders renders registration and notification requirements excessive as applied to juvenile offenders).

*Cost-effectiveness*

Logan also makes a fiscal argument. He points out that A.B. 579 was passed quickly with the expectation that Nevada would receive grant monies from the federal government in return. According to Logan,

those monies never materialized. Further, he claims A.B. 579 will require the State of Nevada to spend precious funds in an inefficient manner because it requires the supervision of a large group of low-risk offenders.

Logan presents a compelling policy consideration that warrants serious reflection by the Legislature. But policy considerations are not material to our ex post facto analysis because they are relevant only to whether the statutory scheme is the best manner to achieve legislative goals, and that question is solely in the Legislature's purview. In our ex post facto analysis, we are limited to considering whether the statutory scheme is reasonable in light of its goals, *see Smith*, 538 U.S. at 105, and Logan has failed to demonstrate that A.B. 579 is unreasonable in light of the goal of public safety.

Lastly, although not discussed by the parties, we find it significant that A.B. 579 does not subject all juveniles adjudicated for offenses involving sex to registration and notification. Only adjudications for three offenses—sexual assault, battery with intent to commit sexual assault, and lewdness with a child—and attempts or conspiracy to commit those offenses trigger the requirements. NRS 62F.200(1); NRS 179D.095(1)(b). Conversely, adults are subject to registration and notification for a much broader category of offenses. *See* NRS 179D.097. And juvenile offenders are excluded from registration and notification requirements if they were under the age of 14 at the time of the offense or if the offense involved consensual sexual conduct where the victim was at least 13 years old and the offender was not more than 4 years older than

the victim. NRS 62F.200(2); NRS 179D.097(2)(b). These restrictions appear to be an attempt to limit the application of A.B. 579 to only those juvenile sex offenders who pose the highest risk of reoffense, and thus undercut Logan's contention that the statutory scheme is excessive. Accordingly, we conclude that A.B. 579 is not excessive as applied to juvenile sex offenders, and this factor weighs in favor of a finding that A.B. 579's effect is not punitive.[12]

*Remaining factors*

The final factors to consider in our ex post facto analysis are whether the statutory scheme applies to conduct that is already a crime and whether the scheme takes effect only after a finding of scienter. *See Smith*, 538 U.S. at 105. These factors "are of little weight." *Id.* The challenged legislation applies only to conduct that was a delinquent act. This factor thus weighs in favor of a finding that A.B. 579 is punitive. Just as in *Smith*, the statutory requirements are not founded on any "present or repeated violation"; therefore, no finding of scienter is required

---

[12]Logan relies heavily on the Supreme Court of Alaska's decision in *Doe v. State*, 189 P.3d 999 (Alaska 2008), the Alabama Court of Criminal Appeals' holding in *State v. C.M.*, 746 So. 2d 410 (Ala. Crim. App. 1999), and the Kansas Supreme Court's decision in *State v. Myers*, 923 P.2d 1024, 1041-42 (Kan. 1996), wherein each court determined that registration and community notification requirements were excessive. We are not persuaded by these cases, particularly because they do not conform to the Supreme Court's analysis in *Smith*.

to trigger the statutory requirements. This factor weighs in favor of finding that the bill is not punitive. *Id.*; *Helman*, 784 A.2d at 1078.

Considering all the factors, we conclude that Logan has failed to demonstrate by the "clearest proof" that the effects of A.B. 579 are so punitive as to negate the legislative intent to impose a civil regulatory scheme. Six of the seven factors, including the one to be given the most weight, indicate that the statutory scheme is not punitive, while only one factor, one to be accorded little weight, indicates a punitive effect.[13] Accordingly, we conclude that retroactive application of A.B. 579 to

---

[13]In light of our conclusion here, Logan's contention that A.B. 579 imposes cruel and/or unusual punishment on juvenile sex offenders necessarily fails. *See* U.S. Const. amend. VIII; Nev. Const. art. 1, § 6; *Doe v. Weld*, 954 F. Supp. 425, 436 (D. Mass. 1996) (because juvenile sex offender registration requirements are probably not punishment, plaintiff could not succeed on claim that imposition of requirements constituted cruel and unusual punishment); *People ex rel. Birkett v. Konetski*, 909 N.E.2d 783, 799 (Ill. 2009) (concluding that imposition of registration requirements on juvenile offenders was not punishment and thus does not constitute cruel and unusual punishment, and rejecting juvenile's request to reconsider that conclusion in light of Supreme Court's holding in *Roper v. Simmons*, 543 U.S. 551 (2005)); *In re D.L.*, 160 S.W.3d 155, 162 (Tex. App. 2005) (because registration and notification are nonpunitive, statutory scheme does not constitute cruel and unusual punishment); *see also, e.g.*, *State v. Guidry*, 96 P.3d 242, 257 (Haw. 2004) (adult sex offender registration requirements are not punishment and thus do not violate state constitution's ban on cruel and unusual punishment); *People v. Adams*, 581 N.E.2d 637, 640-41 (Ill. 1991) (same).

juvenile sex offenders does not violate the Ex Post Facto Clauses of the United States and Nevada Constitutions.[14]

*Right to jury trial*

Logan next contends that the imposition of registration and community notification on juvenile sex offenders transforms the juvenile system into a criminal system and implicates the right to a jury trial. We disagree.

The fact that A.B. 579 subjects juvenile sex offenders to registration and community notification does not eliminate the many differences between the juvenile and adult justice systems. For example, juvenile sex offenders are not "convicted," cannot be sentenced to prison, and are not subject to the civil disabilities resulting from convictions. NRS 62E.010. The focus on rehabilitation in the juvenile system is much greater than in the criminal system. And when implementing the juvenile code, the child's welfare is a central concern. *See* NRS 62A.360(1)(a); *In re Seven Minors*, 99 Nev. 427, 432-33, 664 P.2d 947, 950-51 (1983), *disapproved on other grounds as stated in In re William S.*, 122 Nev. 432,

---

[14]Logan also contends that application of retroactive registration and community notification requirements violates the Contracts Clauses of the United States and Nevada Constitutions. He does not, however, support this assertion with cogent argument or citation to persuasive authority. *See Maresca v. State*, 103 Nev. 669, 673, 748 P.2d 3, 6 (1987). We therefore decline to consider this contention.

442 n.23, 132 P.3d 1015, 1021 n.23 (2006). There is no corresponding concern with the welfare of adult offenders in the criminal code.

Logan points to authority from other state courts invalidating laws or regulations imposed on juveniles in the absence of a jury trial. The holdings in these cases, however, are based on the conclusion that the challenged legislation subjected juvenile offenders to the same criminal punishments as adults convicted in the criminal system. *See In re C.B.*, 708 So. 2d 391, 399-400 (La. 1998) (invalidating statute and corresponding regulation allowing juvenile delinquents to be housed in adult penal facilities where they were required to perform hard labor); *In re Hezzie R.*, 580 N.W.2d 660, 674 (Wis. 1998) (holding statute providing for the transfer of juvenile delinquents to adult prisons in the absence of a jury trial unconstitutional). Our conclusion that registration and community notification are not punishments forecloses Logan's argument that it is unconstitutional to impose these "criminal punishments" on juveniles without the protection of a jury trial. *See, e.g., United States v. Juvenile Male*, 670 F.3d 999, 1014 (9th Cir.), *cert. denied*, 568 U.S. ___, 133 S. Ct. 234 (2012) (fact that juvenile sex offenders are subject to the same requirements as adult sex offenders does not transform juvenile proceedings into criminal proceedings); *In re Jonathon C.B.*, 958 N.E.2d 227, 247 (Ill. 2011) ("[T]he fact that in a narrow set of delineated circumstances delinquent minors face some of the same collateral consequences as convicted adult criminals does not equate a delinquency adjudication with a criminal conviction."), *cert. denied*, 568 U.S. ___, 133 S.

45

Ct. 102 (2012); *Konetski*, 909 N.E.2d at 797-98 (rejecting juvenile's claim that imposing sex offender registration and limited community notification requirements on juvenile offender in absence of a jury trial violate procedural due process where those requirements were not punishment); *see also McKeiver v. Pennsylvania*, 403 U.S. 528 (1971) (discussing due process rights of juvenile offenders and concluding that fundamental fairness does not require a jury trial in juvenile proceedings) (plurality opinion). *But see In re C.P.*, 967 N.E.2d 729, 734, 748-50 (Ohio 2012) (concluding that registration and community notification are punishment and their mandatory imposition on juveniles is fundamentally unfair because it is contrary to the rehabilitative purpose of the juvenile system and the juvenile court lacks discretion regarding imposition of an adult punishment on juvenile offenders).

Despite our decision today upholding the constitutionality of mandatory sex offender registration and community notification for juvenile offenders, we echo the juvenile court's concerns regarding this legislation. Numerous studies and commentators indicate that subjecting juvenile sex offenders to registration and community notification may not be an effective policy decision. *See, e.g.*, Justice Policy Institute, *The Negative Impact of Registries on Youth: Why are Youth Different from Adults?*, *available at* http://www.justicepolicy.org/uploads/justicepolicy/documents/ 08-08_fac_sornakidsaredifferent_jj.pdf (stigma resulting from sex offender registration undermines treatment and rehabilitation programs for juveniles); Justice Policy Institute, *Youth Who Commit Sex Offenses: Facts and Fiction*, *available at* http://www.justicepolicy.org/uploads/justicepolicy/

documents/08-08_fac_sornafactfiction_jj.pdf (noting that juveniles are especially amenable to treatment). As noted by Logan, the registration and notification programs are expensive, and there are doubts regarding the effectiveness of community notification in preventing crime. *See, e.g.,* Human Rights Watch, *No Easy Answers* (Sept. 12, 2007), *available at* http://www.hrw.org/node/10685/section/2; Michele L. Earl-Hubbard, *The Child Sex Offender Registration Laws: The Punishment, Liberty Deprivation, and Unintended Results Associated with the Scarlet Letter Laws of the 1990's,* 90 Nw. U. L. Rev. 788, 855-56 (1996) (noting that community notification can impede the development of normal social skills, which can, in turn, lead to recidivism); Britney M. Bowater, Comment, *Adam Walsh Child Protection and Safety Act of 2006: Is There a Better Way to Tailor the Sentences of Juvenile Sex Offenders?,* 57 Cath. U. L. Rev. 817, 836-37 (2008) (noting that the American Bar Association and Coalition for Juvenile Justice strongly oppose requiring juvenile sex offenders to register because of its potential to negatively affect treatment of juvenile offenders).

We agree that the prior statutory scheme, which left the decision to subject juvenile sex offenders to adult registration and community notification requirements to the discretion of the juvenile court based on specified factors, was a superior method of protecting the various interests at stake, including public safety, the welfare of juvenile sex offenders, and conservation of public resources. The juvenile court, relying on extensive information specific to the juvenile and the offense, is in the

best position to determine whether adult registration and community notification is necessary in a given case. And, significantly, since passage of A.B. 579, the United States Attorney General exercised his statutory authority "to provide that jurisdictions need not publicly disclose information concerning persons required to register on the basis of juvenile delinquency adjudications." Supplemental Guidelines for Sex Offender Registration and Notification, 76 Fed. Reg. 1630-31, 1632 (Jan. 11, 2011). Accordingly, "[t]here is no remaining requirement under SORNA that jurisdictions engage in any form of public disclosure or notification regarding juvenile delinquent sex offenders." *Id.* Thus, it appears Nevada would suffer no loss of funding if the Legislature removed the provisions of A.B. 579 requiring all juvenile sex offenders to submit to community notification. We recognize that these policy considerations are outside the scope of our review of the challenged legislation, *see, e.g., Anthony v. State of Nev.*, 94 Nev. 338, 341, 580 P.2d 939, 941 (1978) ("[T]he judiciary will not declare an act void because it disagrees with the wisdom of the Legislature."), but nonetheless invite the Legislature to reconsider A.B. 579 and its application to juvenile sex offenders.

We grant the petition for a writ of mandamus and direct the clerk of this court to issue a writ directing the juvenile court to vacate its

order declaring A.B. 579 unconstitutional as applied to juvenile sex offenders.

_____ , J.
Douglas

We concur:

_____ , C. J.
Pickering

_____ , J.
Gibbons

_____ , J.
Parraguirre

CHERRY, J., with whom HARDESTY and SAITTA, JJ., agree, dissenting:

I would deny the petition because I conclude that the retroactive application of mandatory sex offender registration and community notification requirements on juvenile sex offenders violates the Ex Post Facto Clauses of the United States and Nevada Constitutions. U.S. Const. art. I, § 10; Nev. Const. art. 1, § 15.

I agree that the Supreme Court's decision in *Smith v. Doe*, 538 U.S. 84 (2003), provides the appropriate framework for analysis of this issue. I also agree that Logan fails to demonstrate that the legislative intent of A.B. 579 was to punish. I conclude, however, that the statutory scheme, when applied to juvenile sex offenders, is "so punitive either in purpose or effect as to negate the State's intention to deem it civil." *Id.* at 92 (internal quotation marks and brackets omitted).

Initially, I agree with the majority's conclusions regarding four of the seven factors—that the statutory scheme does not promote the traditional aims of punishment, is rationally related to a legitimate state interest, is not based on a finding of scienter, and applies to conduct that is already a crime. I disagree with the majority's conclusions regarding the remaining factors, however.

*Historical form of punishment*

First, I conclude that registration and community notification, as applied to juvenile sex offenders, are akin to the historical punishments of branding and shaming. The *Smith* Court rejected this argument, in part, because any resulting stigma arose from the dissemination of accurate information about an offender's criminal record—*the majority of which was already public*—not from any public display for ridicule and shaming. *Id.* at 98. The Court therefore concluded that publication of sex

offenders' records on a website is "more analogous to a visit to an official archive of criminal records than it is to a scheme forcing an offender to appear in public with some visible badge of past criminality." *Id.* at 99. This analogy fails when applied to juvenile sex offenders because juveniles' records are inaccessible to the general public in the absence of a court order. *See* NRS 62H.030(2)-(3).

I recognize that, prior to A.B. 579, juvenile community notification allowed the disclosure of records of Tier II and III juvenile sex offenders. Office of the Nev. Attorney Gen., *Nevada's Guidelines and Procedures for Community Notification of Juvenile Sex Offenders*, Office of the Attorney General, § 8.00(3)-(4) (Rev. Feb. 2006). This disclosure, however, was limited to persons or entities who were "reasonably likely to encounter the juvenile sex offender." *Id.* That is a far cry from the notification provisions of A.B. 579, under which any member of the public, likely to encounter the juvenile or not, must be provided with the juvenile sex offender's registration information upon request.[1] NRS 179B.250; NRS 179D.475. In my opinion, the limited disclosure of juvenile sex offender records that existed prior to A.B. 579 does not allow for the conclusion that the bill's community notification provisions are "analogous to a visit to an official archive of criminal records."

---

[1]Registration records are exempted from disclosure on the community notification website if the sex offender is a Tier I offender and was not adjudicated for a crime against a child. NRS 179B.250(7)(b).

*Affirmative disability or restraint*

Second, I conclude that A.B. 579 imposes an affirmative disability or restraint on juvenile sex offenders. As acknowledged by the *Smith* Court, the public availability of conviction information "may have a lasting and painful impact on the convicted sex offender." 538 U.S. at 101. The Court concluded that community notification did not impose disabilities or restraints on adult offenders because any adverse consequences, such as occupational or housing disadvantages, flow not from community notification provisions, but from the fact of conviction, which is a matter of public record. *Id.* The Court also noted that adverse consequences could have otherwise occurred via the use of routine background checks by employers and landlords. *Id.* at 100.

Such reasoning cannot be applied to juvenile sex offenders, whose records are not generally public. Because juvenile sex offender records were not available to the public in the absence of a court order, NRS 62H.030(2), routine background checks would not reveal these records. As discussed above, A.B. 579's community notification requirements greatly expand the limited disclosure of records that occurred under juvenile community notification. The prior limited disclosure does not justify the conclusion that the bill does not impose an additional affirmative disability or restraint on juvenile sex offenders. I conclude that any occupational or housing disadvantages suffered by delinquent sex offenders result not from the fact of adjudication, but directly from the community notification requirement. *See State v. C.M.*, 746 So. 2d 410, 418 (Ala. Crim. App. 1999) (concluding that subjecting juvenile sex offenders to registration and community notification requirements imposed an affirmative disability or restraint in part

because it exposed confidential adjudication records to the public). And I note that such discrimination is particularly burdensome on juveniles who are newly independent and have not yet had the opportunity to establish themselves in the world. *See In re C.P.*, 967 N.E.2d 729, 741-42 (Ohio 2012) (considering stigmatization and other negative consequences of community notification on juvenile offenders in the context of a cruel-and-unusual-punishment claim).

The majority concludes that the notification provisions themselves do not impose any negative consequences because those consequences "result indirectly from the public's response to knowledge of the adjudication." *See* majority opinion *ante* at 34. This conclusion fails to account for the real-world effect of A.B. 579's notification provisions. But for those provisions, the public would have no easy means to access juvenile sex offenders' records. For these reasons, I conclude that A.B. 579 imposes an affirmative disability or restraint on juvenile sex offenders.

*Excessiveness*

Third, I conclude that A.B. 579 is excessive in relation to its purpose. I am cognizant of the fact that the excessiveness analysis is not an inquiry into "whether the legislature has made the best choice possible to address the problem it seeks to remedy." *Smith*, 538 U.S. at 105. Nevertheless, I conclude that the statutory scheme, as applied to juvenile sex offenders, is not reasonable in light of the Legislature's nonpunitive objective. *See id.* (the excessiveness inquiry focuses on "whether the regulatory means chosen are reasonable in light of the nonpunitive objective").

The mandatory application of community notification requirements to juvenile sex offenders is unreasonable in light

of the lower recidivism rates among juveniles as compared to adult offenders. *See* majority opinion *ante*, at 38-39. And juvenile offenders are highly amenable to treatment. Justice Policy Institute, *The Negative Impact of Registries on Youth: Why are Youth Different from Adults?*, *available at* http://www.justicepolicy.org/uploads/justicepolicy/documents/ 08-08_fac_sornakidsaredifferent_jj.pdf; Affidavit of Dr. Rayna Rogers ¶ 18, Dec. 20, 2007 (noting that "most youthful offenders can be fully treated" and their "recidivism rate is significantly lower than adult offenders") (exhibit to motion filed in district court on Dec. 28, 2007). Juveniles' amenability to treatment is especially significant because the juvenile justice system is specifically designed to provide juvenile delinquents with needed treatment. *See* NRS 62G.410 ("It is the policy of this state to rehabilitate delinquent children."); *see also* NRS 62A.360(1)(a) (every child under the jurisdiction of the juvenile court shall receive the guidance, care, and control that is conducive to the best interest of the State and the child's welfare); NRS 62E.280(1)(a) (the juvenile court may order any psychological, psychiatric, or other care or treatment that is in the best interest of the juvenile); NRS 63.180 (juvenile delinquents placed in state facilities receive a program of treatment aimed at altering behavior and attitude so that the juvenile may freely function in his or her regular environment).

Moreover, A.B. 579 imposes mandatory community notification requirements regardless of risk of reoffense and assigns juvenile sex offenders to a tier based solely on the offense committed. NRS 179D.115-.117; NRS 179D.441; NRS 179D.445; NRS 179D.460; NRS 179D.475. Considering juveniles' low recidivism rates and amenability to treatment, it is my opinion that the statutory scheme is grossly

overinclusive and needlessly sweeps up children who have a very low risk of recidivism. *See Smith*, 538 U.S. at 116-17 (Ginsburg, J., dissenting); *Doe*, 189 P.3d at 1017. Under this legislation, even juveniles who have successfully completed treatment and been certified as a low risk to reoffend will remain subject to registration and community notification requirements for a minimum of ten years. *See* NRS 179D.490. Further, adults, adjudicated delinquent perhaps decades ago, who have been rehabilitated and successfully reintegrated into society, will now be subject to its requirements. *See* NRS 179D.095(1).

Under the prior version of juvenile community notification, only organizations deemed reasonably likely to encounter a juvenile sex offender were actively notified of a juvenile's presence in the community. Office of the Nev. Attorney Gen., *Nevada's Guidelines and Procedures for Community Notification of Juvenile Sex Offenders*, Office of the Attorney General, § 8.0 (Rev. Feb. 2006). A.B. 579 requires that certain organizations be notified regardless of any likelihood of encountering a juvenile offender. NRS 179D.475(2). Such a broad scope of notification is completely unnecessary considering juveniles' low recidivism rates and amenability to treatment. A.B. 579, as applied to juvenile sex offenders, is excessive in relation to its purpose of public protection.

Balancing all of the factors, I conclude that the imposition of mandatory registration and community notification requirements on juvenile sex offenders constitutes a punishment. *See Bell v. Wolfish*, 441 U.S. 520, 539 n.20 (1979) (explaining that harsh conditions imposed to achieve goals that can be attained in many alternative, less harsh ways generally supports a finding that the purpose of the conditions is to punish). Therefore, retroactive application of A.B. 579 to juvenile

SUPREME COURT
OF
NEVADA

(O) 1947A

6

offenders violates the Ex Post Facto Clauses of the Nevada and United States Constitutions.

I wholeheartedly join my colleagues' invitation to the Legislature to reconsider this legislation as applied to juveniles. I urge our legislators to give serious consideration to the concerns raised by the juvenile court and presented in this court's opinion today.

_____, J.
Cherry


We concur:


_____, J.
Hardesty

_____, J.
Saitta